Defendants J.E.M. Building Corporation and Joseph Pitzulo appeal from the judgment of the Medina Court of Common Pleas, following a jury trial, which found them liable for breach of contract and for violating Chapter 1345 of the Revised Code, Ohio's Consumer Sales Practices Act. This court affirms.
 I.
On April 1, 1997, Thomas and Nancy Inserra contracted to buy a home at 4945 Shady Brooke Run in Medina from J.E.M. Building Corporation, a.k.a. JEM Homes ("J.E.M."), a closely-held Ohio Ccorporation. At all times, the couple dealt primarily with Joseph Pitzulo, who is a shareholder and principal of J.E.M. The Inserras lived in Chicago at the time of the purchase. Mr. Inserra had already begun work with a new employer in Medina, and the family was in the process of relocating here. When the Inserras viewed the home, it was approximately ninety-five percent complete.[1] However, the Inserras decided that they wanted to have three-quarters of the basement "finished" with drywall, carpeting, an extra room, and a bathroom. They also included some upgrades in the rest of the house in the purchase agreement. The total purchase price was $365,000.
The initial agreement listed a closing date of April 25, 1997, but the contract was contingent upon the Inserras' sale of their Chicago home. When an initial sale of the Chicago home fell through, J.E.M. and the Inserras signed an addendum to the original contract. The addendum was signed on April 16, 1997, and it provided that all contingencies would be removed by May 25, 1997. The closing date, as set by the addendum, was July 11, 1997. The contract provided that J.E.M. would deliver to the Inserras a habitable home, with the included appointments.
The Inserras selected most of the options for the house in early April, before Mrs. Inserra had to return to Chicago. From April to July, Mr. Inserra visited the homesite frequently, to check on its progress. Prior to returning to Chicago for the closing on their Chicago house, Mr. Inserra contacted Mr. Pitzulo to confirm that the family could close on and move into the Medina home on July 11. Mr. Pitzulo repeatedly assured Mr. Inserra that the house would be completed by that time. The Inserras closed on the Chicago home on July 10, and immediately drove to Medina to close on the new house. The movers had packed the household furnishings and were en route to Medina.
When the Inserras arrived at the new home for the closing on July 11, they found that the house was not finished. There were no commodes; the kitchen appliances were not installed; the carpet was not installed; the deck was not completed; there was no landscaping; the water line was not in service; and the housing inspector had not conducted a final inspection or approved the house for occupancy. In short, the house was not habitable. Virtually no work had been done on the basement remodeling. Both parties agreed to a closing on July 18. Mr. Pitzulo assured the couple that the house would be completed by that date and he advised them that in the meantime he would leave the garage unlocked so the movers could store the furniture in the garage. However, when the movers arrived, the garage was locked and the Inserras had to arrange to have the furniture placed in storage. The Inserras and their two young children moved into the one-bedroom apartment in Cuyahoga Falls where Mr. Inserra had resided since his job transfer.
On July 18, the parties closed on the house. However, much of the work was still incomplete. In fact, the house was virtually the same condition as it had been the week before. There were no doors on the bathrooms, because much of the carpet had not yet been installed, thus delaying the installation of the doors. Part of the counter in the kitchen was not yet installed. The basement was in essentially the same condition as it had been the week before. The air conditioning did not work, and there were screens on only two windows. However, the city housing inspector granted a temporary residency permit and the family began to occupy the house on July 18.
Because of the large amount of work yet to be completed, Mr. Inserra insisted that $18,750 of the purchase money be held in escrow by Norwest Escrow, Inc. ("Norwest"). Mr. Inserra and Mr. Pitzulo signed a repair escrow agreement that assigned dollar amounts to the various portions of the construction yet to be completed. The agreement stated that upon the determination of an independent appraiser that Mr. Pitzulo had completed portions of the work, Mr. Pitzulo would be compensated in the amount assigned to the various tasks, in two "draws" or payments. The agreement provided for the work to be completed by August 15, 1997. Mr. Pitzulo determined that he was entitled to $11,000 of the escrow amount, and on August 7, he applied to Norwest for a "draw" of that amount. On August 8, Norwest's appraiser evaluated the work, and determined that Mr. Pitzulo was entitled to $5,750. However, upon being denied the requested $11,000, Mr. Pitzulo filed a mechanic's lien with the Medina County recorder's office, and left the job site.
On August 20, 1997, the Inserras filed the instant suit against J.E.M. Building Corporation, Mr. Pitzulo and Norwest Escrow Inc.[2] Their claims against J.E.M. were for breach of contract on the original purchase, breach of contract on the escrow agreement, fraud, and violation of Ohio's Consumer Sales Practices Act (CSPA). The claim against Mr. Pitzulo was based on his alleged CSPA violations. On October 1, 1997, Mr. Inserra filed with the county recorder's office an affidavit which alleged that Mr. Pitzulo had "diverted resources" from the Inserra house to other properties owned by J.E.M. Mr. Pitzulo and J.E.M. counterclaimed for breach of the escrow agreement, defamation, slander of title, and Mr. Pitzulo filed a claim of harassment against the Inserras for naming him personally in their lawsuit. The Inserras hired another contractor to complete the work at a cost of $22,000. They incurred $7,239 in moving, storage and rental costs.
The case proceeded to a jury trial. The witnesses included: the Inserras, Mr. Pitzulo, his business partner Mrs. Bixler, the Norwest appraiser, the Norwest escrow officer, a supplier, and the Inserras' second contractor.
Mr. Pitzulo was vague on details, and his testimony was often contradicted by other evidence or his own inconsistent statements. For example, he denied that the meeting at the house on July 11 was intended to be a closing. However, the Norwest appraiser, who needed to conduct a final inspection for closing, was at the house on July 11 to conduct an inspection for that very purpose. Mr. Pitzulo also claimed that the Inserras continuously made changes to the original plans, and it was the constant changing of plans that caused the delay in completing the house. Mr. Pitzulo implied that one of the changes involved the carpeting, which was a Berber type with a definite pattern. However, the original sales contract of April 1 called for Berber carpet throughout, Mrs. Inserra testified that she made most of the selections in April and that she never changed the carpet ordered, and Mrs. Bixler of J.E.M. who handled these details testified that Mrs. Inserra chose the Berber carpeting when she was in town in April. Mrs. Bixler did not testify that the Inserras made changes to the original carpeting order. Mr. Pitzulo testified that the Inserras changed the basement plans to include a separate room, in addition to the bath. He later contradicted that statement and testified that the separate room was part of the original basement plan.
When asked about his request for the $11,000 draw, Mr. Pitzulo's testimony was vague. He could not justify that amount with any degree of certainty, and he acknowledged that Mr. Inserra agreed to have a "draw" paid, after an inspection by the Norwest appraiser who would determine the amount of work which had been done. When asked if he doubted that Norwest would pay him in full once the work was done, Mr. Pitzulo answered "No." Mrs. Bixler testified that J.E.M. requested a draw for $11,000 or in the alternative $5,750. The Norwest appraiser ultimately concluded that of the $18,750 in escrow work originally agreed upon, by August 8, $13,000 was left to be completed. Thus, J.E.M. was entitled to a draw of $5,750, the very amount that Mr. Inserra agreed should be paid. It is unclear why, if J.E.M. was willing to accept $5,750 for a draw, Mr. Pitzulo walked off the job and filed the mechanic's lien for $11,000.
Mr. Pitzulo testified that he accepted a smaller down payment from the Inserras than is typical for a house of this price. He also testified that as of July 1997, he had a backup buyer who was willing to pay more money for the house than the Inserras' purchase price.
The jury rendered the following verdicts in favor of the Inserras: for $5,000 on the breach of the purchase contract against J.E.M.; for $14,619.50 plus one-half of the attorney fees for violation of CSPA against J.E.M.; for $14,619.50 plus one-half of the attorney fees for violation of CSPA against Mr. Pitzulo. The jury found in favor of Mr. Pitzulo on the defamation claim, and it awarded him $1,000. Although the jury found that Mr. Inserra acted with malice in the defamation, the jury awarded $0 in punitive damages, but the jury did award attorney fees. Ultimately the trial court denied attorney fees for both plaintiffs and defendants on their respective claims, due to the failure of each side to provide the court with an accurate allocation of fees incurred to the various claims. The court concluded that it was required by law to treble the damages for violation of CSPA, pursuant to the statute. Thus, the trial court entered judgment in favor of the Inserras in the amount of $43,858.50 against J.E.M. and in the amount of $43,858.50 against Mr. Pitzulo.
The trial court denied the defendants' motion for a new trial or JNOV. Following the entry of a final judgment on April 15, 1999, the remaining escrow funds of $17,999 were released to the plaintiffs. Defendants did not file a stay pending appeal.
Mr. Pitzulo and J.E.M. filed the instant appeal, assigning seven errors. We have rearranged them for ease of discussion.
 II. THE JURY VERDICT AGAINST PITZULO THAT HE VIOLATED THE OHIO CONSUMER SALES PRACTICES ACT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 THE JURY INSTRUCTION THAT PITZULO IS A SUPPLIER AS DEFINED UNDER THE OHIO CONSUMER SALES PRACTICES ACT IS UNSUPPORTED BY THE EVIDENCE.
 THE TRIAL COURT FINDINGS AGAINST PITZULO AND J.E.M. PRODUCED A RESULT INCONSISTENT WITH SUBSTANTIAL JUSTICE.
 THE JURY INSTRUCTION THAT PITZULO IS A SUPPLIER AS DEFINED UNDER THE OHIO CONSUMER SALES PRACTICES ACT IS "PLAIN ERROR."
These four assignments of error essentially challenge the trial court's legal determination, and the jury verdict based thereon, that Mr. Pitzulo could be found liable for violating the CSPA, when he was acting as an agent of J.E.M., which is a corporate entity. Essentially, Mr. Pitzulo argues that he cannot be held personally liable because he is a shareholder and officer of the corporation that entered into a contract with the Inserras. The trial court, after considering argument from counsel for both sides, determined that pursuant to CSPA, Mr. Pitzulo was a "supplier" as defined by the statute, and could be held personally liable for his violations of the CSPA.
Ohio's Consumer Sales Practices Act is codified in R.C. 1345.01 etseq. The CSPA prohibits false and deceptive practices in consumer transactions. The CSPA states: "`Consumer transaction' means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." R.C. 1345.01(A). The Ohio Administrative Code defines "services" as follows: "`Services' means performance of labor for the benefit of another. Services include, but are in no way limited to, the construction of a single-family dwelling unit by a supplier on the real property of a consumer."[3] Ohio Adm. Code 109:4-3-01(C)(2). "`Supplier' means a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not he deals directly with the consumer." R.C. 1345.01(C). The Ohio Administrative Code is designed to be "liberally construed and applied to promote their purposes and policies. The purposes and policies of these rules are to * * * [e]ncourage the development of fair consumer sales practices." Ohio Adm. Code 109:4-3-01(A).
It is clear from the definition of "supplier" that both J.E.M. and Mr. Pitzulo are suppliers under the CSPA. However, Mr. Pitzulo appeals the determination of the trial court that he can be held personally liable for actions that he undertook as an agent of J.E.M., a corporate enterprise. He also claims that he is immune from personal liability because he is a shareholder and corporate officer.
Normally, a corporate officer or shareholder will not be held liable for the debts or acts of the corporate entity. An exception exists where, upon piercing the corporate veil, it appears that a corporation is simply the "alter ego" of the individual sought to be held liable.Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.
(1993), 67 Ohio St.3d 274, 287. The Ohio Supreme Court stated the requirements for piercing the corporate veil in Belvedere:
 The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.
Id. at paragraph three of the syllabus.
Mr. Pitzulo argues that the Inserras did not meet the threshold showing required by Belvedere to hold him liable, as a corporate officer and shareholder, for the alleged harm done by J.E.M. However, an individual can also be held personally liable for violations of CSPA. This court has held that an employee who makes false and misleading representations in a consumer transaction can be personally liable under CSPA. Sovel v.Richardson (Nov. 15, 1995), Summit App. No. 17150, unreported at 7. See, also, Armstrong v. Kittinger (Sept. 21, 1994), Summit App. No. 16124, 16378, unreported; Gayer v. Ohio Bus. Trading Assn. (July 7, 1988), Cuyahoga App. No. 54892, unreported.
Under the CSPA, if an individual employee engages in unfair consumer acts and deals directly with the consumer, that person can be held personally liable, notwithstanding that the individual acted as an agent of his employer. See Sovel, Summit App. No 17150, unreported, at 6-7;Grayson v. Cadillac Builders, Inc. (Sept. 14, 1995), Cuyahoga App. No. 68551, unreported, citing State ex rel. Fisher v. Harper (1993),83 Ohio App.3d 754, and State ex rel. Fisher v. American Courts, Inc.
(July 21, 1994), Cuyahoga App. No. 65939, unreported. "When a cause of action is based upon an employee's actions, the employee is primarily liable to the injured party and the employer is secondarily liable to the injured party." Carter v. Taylor (Dec. 9, 1999), Lawrence App. No. 99CA10, unreported, citing Shaver v. Shirks Motor Express Corp. (1955)163 Ohio St. 484 and Losito v. Kruse (1940), 136 Ohio St. 183.
Therefore, a shareholder who does not directly engage in a CSPA violation could not be held personally liable for resulting injuries unless the injured party could appropriately pierce the corporate veil. However, if the individual shareholder personally commits acts in violation of CSPA on behalf of the corporation, he can be held personally liable for damages caused by his own acts. There is no need to pierce the corporate veil. See Carter, Lawrence App. No. 99CA10, unreported. There is no question that Mr. Pitzulo personally engaged in violation of CSPA and is a supplier, pursuant to the act, who can be held liable for damages resulting from his violations of the act. His liability flows not from his status as a shareholder or even an officer of J.E.M., but from his personal actions in violating CSPA.
The jury instruction stating that "defendants, J.E.M. Homes and Joseph Pitzulo are suppliers" under CSPA was accurate and appropriate given the facts and circumstances of this case. Mr. Pitzulo did not object to the jury instruction, but he urges this court to apply the doctrine of plain error. See Reichert v. Ingersoll (1985), 18 Ohio St.3d 220, 223. However, since the jury instruction was not erroneous, the plain error doctrine does not apply. We overrule Mr. Pitzulo's second and fifth assignments of error.
We also conclude that the jury's verdict was not against the manifest weight of the evidence. "When evaluating whether a judgment is against the manifest weight of the evidence in a civil context, the standard of review is the same as that in the criminal context." Frederick v. Born
(Aug. 21, 1996), Lorain App. No. 95CA006286, unreported, at 14. When an appellate court reviews the weight of the evidence
 [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.
State v. Martin (1983), 20 Ohio App.3d 172, 175. Only in the exceptional case, where the evidence presented weighs heavily against the verdict, will the appellate court reverse and order a new trial. See State v. Ali
(Apr. 28, 1999), Summit App. No. 19119, unreported, at 9. Our review of the record indicates that the jury did not clearly lose its way in rendering its verdicts.
Appellants argue that a mere delay in delivery of the goods promised is insufficient to hold them liable under CSPA. They cite to Gable v.Collins (Aug. 9, 1990), Cuyahoga App. No. 57384, unreported. The Gable
court determined that a two week delay in the delivery of a washer and dryer did not constitute a violation of CSPA. However, the acts alleged in the instant case far exceed a mere failure to deliver the completed house in a timely manner. We decline to extend the holding in Gable to the instant facts.
We find that the jury did not clearly lose its way and create a manifest miscarriage of justice in rendering its verdict. Appellants' first and fourth assignments of error are overruled.
 III. THE TRIAL COURT ERRED IN ITS JUDGMENT BECAUSE THE JURY ANSWERS TO INTERROGATORIES AND GENERAL VERDICTS ARE INCONSISTENT AND NOT IN CONFORMITY WITH THE TRIAL COURT'S FINAL ORDER.
 INSERRA [sic] MAY NOT BE COMPENSATED TWICE FOR THE ACTUAL DAMAGES INCURRED. SINCE ACTUAL DAMAGES ARE AWARDED TWICE IN BOTH VERDICTS, THERE MUST BE RECONCILIATION TO AVOID DOUBLE DAMAGES.
The appellants' seventh assignment of error claims that because the jury awarded damages of $5,000 on the breach of the original contract, that should be the total measure of damages on the CSPA claims. This argument is completely without merit.
The measure of damages on the breach of the original contract is what would make the Inserras whole. The jury determined that the amount of damages on the breach of the original contract was $5,000, the amount of the earnest money, which should have been returned to the couple if J.E.M. did not want to honor the contract, as evidenced by Mr. Pitzulo's testimony that J.E.M. had another buyer waiting in the wings. The damages for the breach of the original contract was appropriate, and is totally distinct from the other damages incurred by the Inserras for the CSPA violation. The appellants' seventh assignment of error is overruled.
In their third assignment of error, the appellants claim that the judgment entry is not consistent with the jury verdicts and the jury interrogatories on three claims: the verdict in favor of Mr. Pitzulo on the libel claim; the verdict in favor of the Inserras against J.E.M. on the CSPA claim; and the verdict in favor of the Inserras against Mr. Pitzulo on the CSPA claim. This court disagrees.
On the libel claim, the jury found that Mr. Inserra did libel Mr. Pitzulo, and determined that he did so with malice. The jury awarded Mr. Pitzulo $1,000, and awarded punitive damages of $0. The jury awarded Mr. Pitzulo attorney fees. The trial court discussed the libel damages with counsel after the trial had commenced, and defendants stated that their only damages from the libel was attorney fees. The court held a post-trial hearing on the issue of attorney fees for both sides, and determined that counsel for neither side had adequately allocated the fees to the various claims and counterclaims. As a consequence, the court denied attorney fees to both plaintiffs and defendants.
As to the CSPA awards, the appellants claim that the trial court erred because the jury awarded to the Inserras $14,619.50 plus one-half of their attorney fees for the CSPA claim against J.E.M. and the same amount against Mr. Pitzulo for his violation. These awards represented an allocation to each defendant of one-half of the total damages of $29,239.00 incurred by the Inserras due to the CSPA violations, plus one-half of the attorney fees for the CSPA claims.[4]
When the trial court entered its final judgment, it awarded $43,858.50 and no attorney fees for the CSPA claim against J.E.M., and the same amount against Mr. Pitzulo. The final judgment took into consideration (1) the jury verdicts; (2) the mandate pursuant to R.C. 1345.09, that when a consumer elects to obtain damages, rather than to rescind the transaction, the trial court must award treble damages;[5] (3) the failure of the Inserras' counsel to submit a detailed statement of attorney fees for work done specifically on the CSPA claim, even though the trial court gave them ample opportunity to do so; and (4) the court's determination that J.E.M.'s counsel failed to allocate attorney fees attributable only to the libel claim.
Pursuant to the statute, a consumer is entitled to treble damages if the act complained of was "specifically prohibited by a regulation promulgated by the Attorney General pursuant to R.C. 1345.05(B)(2) [or] a deceptive act as determined by a prior court decision." Dotson v.Brondes Motor Sales, Inc. (1993), 90 Ohio App.3d 206, 209. Prior to alleged violations of CSPA involved herein, various Ohio courts had determined that home construction transactions are "consumer transactions" within the meaning of the CSPA and that "[a]n act is deceptive if it `has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts.'" Richards v.Beechmont Volvo (1998), 127 Ohio App.3d 188 190, citing Funk v.Montgomery AMC/Jeep/Renault (1990), 66 Ohio App.3d 815, 823. The trial court appropriately trebled the damages here. See Armstrong v.Kittinger (Sept. 21, 1994), Summit App. No. 16124, 16378, unreported, at 19-20.
The judge did not submit to the jury the issue of treble damages pursuant to the statute because that issue is one of law, which falls within the province of the judge. Id. The jury's duty was to weigh the evidence, determine if liability existed, and if so, to determine the measure of actual damages caused by each defendant. Once the jury made those determinations, the trial court was obliged to consider whether the instant claims were of the type subject to treble damages, pursuant to R.C. 1345.09. The judge here appropriately determined that the claims were subject to treble damages.
The jury determined that after paying the full contract price of $365,000 (part of which remained in escrow), the Inserras were required to pay an extra $22,000 to have the house completed due to the failure of J.E.M. and Mr. Pitzulo to complete the house per the contract. Had J.E.M. and Mr. Pitzulo not engaged in unfair and deceptive consumer practices, the Inserras would have paid $365,000 for a house of that value. Instead, the Inserras paid the $365,000 purchase price, plus $22,000 for a house that both the Inserras and the builder agreed was worth $365,000. Because of the CSPA violations by the builder, the Inserras also incurred an extra $7,239 in damages related to rental costs, storage costs, etc. As a consequence, the Inserras incurred $29,239 in damages, which the jury allocated half to J.E.M. and half to Mr. Pitzulo. The trial court trebled these damages pursuant to the statute. Beyond the statutory treble damages, there was no "double damages" awarded to the Inserras.
This court overrules the appellants' third assignment of error.
 IV. IV. IT IS ERROR FOR THE TRIAL COURT TO RELEASE J.E.M'S MECHANIC'S LIEN.
J.E.M. challenges the release of its mechanic's lien, because that issue was not properly before the court. This court disagrees.
The trial court, in a journal entry dated March 9, 1999, determined that it did not have authority to release the lien, because neither the plaintiffs nor the defendants had properly placed the matter before the court. Yet, in its judgment entry of April 15, 1999, the trial court stated that the lien "is no longer valid as a lien against said property."
J.E.M. now argues that the issue of the mechanic's lien was not properly before the trial court.[6] The Inserras point out that J.E.M.'s counterclaim prayed for the trial court to enforce the lien. Furthermore, at a post-trial hearing on several issues, defendant J.E.M.'s counsel acknowledged that after the jury verdict awarding defendant no money on its breach of contract on the escrow agreement, "that almost, in effect, removes any claim available on the mechanic's lien."
It is clear that the issue of the validity of the mechanic's lien was properly before the trial court. The court, having determined that J.E.M. was not entitled to any amount of compensation which the lien was intended to secure, properly released the lien.
We overrule the sixth assignment of error.
 V.
Having overruled all of appellants' assignments of error, we affirm the judgment of the trial court.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 ___________________________ WILLIAM R. BAIRD
SLABY, J., CARR, J., CONCUR.
[1] The "ninety-five percent" estimate refers to the basic completion of the house. The appraiser from Norwest Escrow provided this percentage, based on his first visit to the home on April 24, 1997. At the time, and for much of the time during the ensuing controversy, the appraiser was unaware that the completed home was supposed to include a finished basement.
[2] Originally, the Inserras named Norwest Mortgage as a defendant, but the trial court permitted them to substitute the proper party, Norwest Escrow Inc. Ultimately, all claims and counterclaims involving Norwest Escrow were dismissed for want of prosecution.
[3] Appellants do not challenge the determination that J.E.M. was liable under the CSPA for unfair practices in this transaction. The CSPA does not apply to transactions involving pure real estate interests. SeeBrown v. Liberty Clubs Inc. (1989), 45 Ohio St.3d 191, syllabus; Rose v.Zaring Homes, Inc. (1997), 122 Ohio App.3d 739, 749; Keiber v. SpicerConstr. Co. (1993), 85 Ohio App.3d 391, 392. However, the CSPA can be applied to new home construction. See Keiber, 85 Ohio App.3d at 392;Keeton v. Hinkle (Mar. 10, 2000), Morrow App. No. CA 871, unreported. Pitzulo claims that "J.E.M. * * * is the sole entity engaged in [these] consumer transactions."
[4] The Inserras do not appeal the judgment entered by the trial court. However, this court notes that pursuant to the jury interrogatories, both J.E.M. and Mr. Pitzulo committed deceptive practices, and as suppliers both defendants are liable for the damages caused to the plaintiffs. See, e.g., State ex rel. Fisher v. Warren StarTheater (1992), 84 Ohio App.3d 435, 443-444; Carter v. Taylor (Dec. 9, 1999), Lawrence App. No. 99CA10, unreported. Consequently, a jury interrogatory inviting the jury to "allocate" damages proportionally to either defendant was erroneous. Both defendants were found to have violated the CSPA, Mr. Pitzulo individually and the corporation through Mr. Pitzulo as its agent. Consequently, both defendants were liable for the total damage caused by their acts.
[5] R.C. 1345.09 (B) provides:
 Where the violation was an act or practice declared to be deceptive or unconscionable by rule adopted under division (B) (2) of section 1345.05 of the Revised Code before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate section 1345.02 or 1345.03
of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code, the consumer may rescind the transaction or recover, but not in a class action, three times the amount of his actual damages or two hundred dollars, whichever is greater.
[6] According to the Statement of the Facts contained in appellants' brief, "[t]he attorneys for both sides agreed to have the trial Court handle the disposition of the funds in escrow and the mechanic's lien filed by J.E.M." Following this statement, appellants refer to page 624 of the trial transcript; however, that page does not contain any mention of the mechanic's lien.