HANNAH et al., Appellants,

v.

SIBCY CLINE REALTORS, a.k.a. Sibcy Cline, Inc., et al., Appellees.*

Court of Appeals of Ohio,
First District, Hamilton County.

Decided Dec. 21, 2001.

---

* Reporter's Note: An appeal to the Supreme Court of Ohio was not allowed in 95 Ohio St.3d 1436, 2002-Ohio-2084, 766 N.E.2d 1002.

Ted L. Wills, for appellants.

Lindhorst & Dreidame, James F. Brockman and David E. Williamson, for appellees.

PAINTER, Judge.

{¶ 1}   In this case, we are asked to determine, in part, whether a real estate agent or broker has the fiduciary duty to (1) inform a client whether a neighborhood or community is ethnically diverse or (2) direct the client to resources that provide ethnic-diversity information.   We conclude that, while a real estate agent or broker may choose to provide such information to a client or to direct a client to resources about the ethnic diversity of a particular neighborhood or community, the agent or broker does so at its own risk, and that there is no fiduciary duty to do so.

## I. Finding a Home in the Cincinnati Area

{¶ 2} Appellants Joel and Zondra Hannah and their three school-aged sons were considering moving their family from Virginia to Cincinnati, Ohio, for both lifestyle and employment reasons. (We refer to the Hannahs by their first names when applicable because they share the same surname.) Zondra contacted appellee Sibcy Cline, Inc. (apparently, Sibcy Cline, Inc. is the proper name of appellee), a real estate brokerage, concerning housing in the summer of 1997. Appellee Mary Kay Carroll, a real estate agent and relocation specialist associated with Sibcy Cline, worked with the Hannahs over a year-long period. The Hannahs also contacted a real estate agent with West Shell and spoke with her three times during the period that they were dealing with Carroll. That agent sent them an information packet. Zondra also contacted Star One Realty and received a relocation guide from the agent there.

{¶ 3} During the initial telephone conversation with Carroll, Zondra explained what she wanted—a five-bedroom house in move-in condition that contained a living room, a dining room, a family room, an eat-in kitchen, a finished basement, and two and one-half baths. She wanted a house of 2,600 to 3,000 square feet that cost $190,000 to $225,000 and sat on either an acre of land or a private setting. Zondra also specified that the house be located in an excellent school district and an ethnically diverse neighborhood. Zondra wanted to replicate her Virginia neighborhood in Cincinnati. Carroll sent the Hannahs a relocation packet that contained a guidebook, a map, and some general brochures.

{¶ 4} According to Zondra, she constantly asked Carroll whether the areas in which Carroll suggested houses were ethnically diverse. The Hannahs both confirmed that Carroll told them that she could not give them that information. But, according to Zondra, Carroll would imply that a neighborhood was diverse by stating that it fit the Hannahs' criteria. Zondra asked Carroll where she could get information concerning ethnic diversity of schools and communities and asked whether organizations existed that she could contact regarding ethnic diversity in neighborhoods. Zondra testified that Carroll responded that no such agencies or organizations existed (Carroll disputed this) and that Zondra could learn the information by cruising around the neighborhoods or from a realtor who knew the areas. Zondra never received the requested information from Carroll.

{¶ 5} Zondra believed that Carroll was sending her Multiple Listing Services sheets that met the criteria the Hannahs were interested in—specific physical characteristics of the house, a racially and economically diverse area, and a good school district. Zondra also received test-score information from different schools both from Carroll and from the schools. Zondra contacted six schools using the telephone numbers supplied in the guidebooks received from Carroll. She asked the person she contacted at each school whether the school was

racially diverse. She did not ask whether a certain percentage of the student body was African–American, but did state that she did not want her child to be the only African–American in his class.

{¶ 6} Zondra also contacted a children's advocacy group to learn about special education in the Cincinnati area. According to Joel, Zondra contacted the local NAACP and the Urban League but did not receive information about ethnic diversity.

## A. The House–Hunting Visits

{¶ 7} The Hannahs met with Carroll in Cincinnati in the fall of 1997. They again told Carroll that they wanted to target racially diverse areas. Carroll took them to several areas. When Zondra asked Carroll about the ethnic diversity of a neighborhood, she responded that most Cincinnati neighborhoods were diverse and that she had chosen the neighborhoods that were being shown based on the Hannahs' criteria. Zondra stated that Carroll would use body language as well to imply responses to her requests.

{¶ 8} The last week of June 1998, the Hannahs returned to Cincinnati either to buy or rent a house because Joel had been transferred to Cincinnati. At that time, the Hannahs asked Carroll to be their agent. On July 4, 1998, the Hannahs and the sellers of a home signed a Disclosure of Agency Relationship form stating that, by signing the form, the Hannahs were consenting to the agency relationship disclosed in the form. It contained a provision that the buyer's agent and the brokerage owed to the buyer the duties of loyalty, obedience, confidentiality, accounting and reasonable skill and care in performing their duties, as well as the "duty to disclose to the buyer all material information obtained from the seller or from any other source." It is this agreement on which the Hannahs' breach-of-contract claim was based.

{¶ 9} During this visit, the Hannahs looked at homes for four days, narrowing their search to the Sycamore, Princeton, Wyoming, and Indian Hill school districts. Failing to find a home to purchase, the Hannahs decided that they wanted to rent. Carroll discouraged them from doing so. Joel asked about a house that he had seen on a listing located in either Loveland or Milford. When Zondra asked whether the areas were ethnically diverse, Carroll sighed and said that they had been "through this before."

{¶ 10} The Hannahs looked at the home in Milford. Zondra talked to two people in the neighborhood. When Zondra asked one neighbor about the schools, the neighbor said that she would either continue to educate her children at home or send them to private school. That neighbor had two bi-racial children, of possibly Hispanic and African–American ethnicity. Zondra talked to another neighbor who said that she knew nothing about the Milford schools because her

children attended Catholic school. Zondra asked both neighbors whether the neighborhood was "well rounded." One made no response, and the other said that she was not certain.

## B.  The Purchase of the Milford Home

{¶ 11}  The Hannahs made an offer on the Milford house on July 4, 1998. But, upon returning to Virginia, they decided that they did not know enough about Milford. The Hannahs called Carroll at 1:00 a.m. on July 5. They agreed to talk later in the day. Carroll told the Hannahs that they would be happy in Milford and that the test scores indicated that the schools were good. Zondra expressed concern about whether the area was ethnically diverse and stated that she did not want to walk into a supermarket and feel uncomfortable or to have her children be the only African–American children in their class.

{¶ 12}  When Zondra "begged" Carroll for information, she told Zondra that she had since sold a home to a black family in Milford and that they had been very happy there. She said that the couple had a young son who attended a private preschool. But Carroll would not provide the telephone number of the couple. She claimed that the couple had moved and that she had no way of contacting them.

{¶ 13}  Carroll told the Hannahs that the sellers of the home they had offered to purchase were out of town and that they still had time to contact someone at the school. Zondra had tried to contact the school as soon as they returned to Virginia, but was unable to do so. She did not try to call the school district, only the elementary school. The sellers threatened to take the home off the market if the Hannahs did not sign by July 12, so they signed the contract.

{¶ 14}  During the week of July 14, Zondra finally reached someone at the elementary school, but the person refused to give her the principal's home telephone number. She called information, received the number, and was able to reach the principal on July 14 at his home. He told her that the school was ethnically diverse.

## C.  The Hannahs' Milford Experience

{¶ 15}  After the Hannahs moved to the neighborhood, they experienced no negative racial incidents. They socialized with neighbors who did not drink or curse. Their children did not have any problems in the neighborhood. But because her three sons played primarily with each other, Zondra perceived the neighborhood as having a "covert feeling." She said that some neighbors were friendly and that some neighbors ignored them.

{¶ 16} Zondra stated that she and her family were uncomfortable at two local restaurants because customers would stare at them when they entered. She and Joel also stated that once an employee would not wait on them at a store. Zondra was also uncomfortable because her family was the only African–American one in the subdivision.

{¶ 17} The Hannahs met with school personnel and were again told that the school was ethnically diverse. Zondra was uncomfortable at the school because she was ignored when she would volunteer. Some of the children were reluctant to stay in her group. The children would comment on the fact that she was black or that "her skin was pretty dark."

{¶ 18} One of her sons was the only African–American child in the fourth grade. All three of her sons were called derogatory names, were taunted and were hit both at school and on the bus on a regular basis.

### D. The Search for a New Location

{¶ 19} After approximately one year, the Hannahs put their home on the market, sold it for a profit, and moved to Symmes Township. Before the move, Zondra requested information from the library regarding demographics of different neighborhoods. She called *Cincinnati Magazine* and received information. She also used a software program concerning different neighborhoods. She called other realtors. One told her that he lived in the Sycamore School District and felt that the school was ethnically diverse. Several agents referred her to Housing Opportunities Made Equal ("HOME'"). Others referred her to the Better Housing League. Another provided her with the names of individuals in the neighborhood that she was interested in moving to and encouraged her to knock on doors and ask questions. Symmes Township has an African–American population of 4.2%, and Milford has an African–American population of 1.5 percent.

### E. Carroll's Side of the Story

{¶ 20} Carroll confirmed that she had told the Hannahs that she was legally precluded from disclosing racial-diversity information concerning neighborhoods. But she acknowledged that she did take that concern into consideration, along with the Hannahs' other criteria, when choosing homes to show the Hannahs. She denied telling the Hannahs anything about the racial composition of any area, or that she could not direct them to other resources. Carroll stated that the Hannahs looked at Milford based on Joel's suggestion. She did not recall Zondra's asking her for other sources of information and stated that she had directed Zondra to the schools for information. She stated that she had told the Hannahs that she had sold a house in Milford to a young couple and that they

were satisfied with the area, but she denied telling the Hannahs that the couple was African–American.

{¶ 21} Carroll also claimed that she provided the Hannahs a copy of *Cincinnati Magazine's* school guide, which contained diversity statistics regarding schools, with the relocation packet that she had sent them. She also stated that she suggested to the Hannahs that they call HOME. She called HOME to get the number of a contact person, but did not recall whether she gave the Hannahs the number. The name and number, however, were in her file of material relating to the Hannahs.

### F. The Handling of Racial–Diversity Questions by Other Witnesses

{¶ 22} Michelle Stacy, Vice–President of Human Resources and Fair Housing Officer for Sibcy Cline, coordinated classes with HOME for real estate agents and was also a board member of HOME. She testified that if a client asked for a diverse neighborhood, she would ask the client what he or she meant by diversity. Once she understood what the client wanted, she would not personally gather the information for him, but would tell him where he could find the information if he felt that he needed direction. She stated that she would refer a client to HOME, or to the Jewish Federation, if the client was Jewish, or to Travelers Aid. She also pointed out that the Internet was a resource. Stacy would then show a client houses in areas that the client had designated.

{¶ 23} Johanna Barkley was identified as the Hannahs' expert. She testified that there was no particular standard in the real estate industry to define what constituted an integrated neighborhood in regard to "steering" practices. "Steering" was defined as trying to direct a person into a neighborhood or away from a neighborhood based on such things as race or religion. Barkley agreed that a good way to discover the diversity of a school was to contact the school. She also considered the Chamber of Commerce or HOME as a source of census information.

{¶ 24} Barkley testified that she had been trained not to answer questions about the racial composition of a neighborhood, but that, when asked, she was to direct clients to other resources. She stated that there was no one absolute source a client had to be referred to and agreed that the public library was a good source of information. She stated that she was not critical of what Carroll had done, but that she would have recommended that the Hannahs contact someone from HOME and would have ensured that the connection was made. While Barkley would personally introduce her clients to the schools, she agreed that it would not be wrong to give the clients the name and number of a school. Barkley stated that she was unaware of any standard in the industry requiring that a prospective purchaser be sent to HOME to answer his or her inquiries

concerning diversity, but that HOME was considered the area expert in fair-housing issues.

{¶ 25} Carla Irvine, Executor Director of HOME, testified that if someone asked about the racial diversity of an area, she would first ask the person to define diversity. She also stated that she could provide them with the 1990 United States Census Bureau statistics that would show the racial composition of a neighborhood. According to Irvine, HOME also compiled ethnic harassment or intimidation reports concerning neighborhoods. She stated that a means to determine diversity was to drive around the neighborhood or to call Hamilton County Regional Planning, the Cincinnati Chamber of Commerce, or HOME. Irvine agreed that real estate agents should not discuss racial diversity because the subject could be misinterpreted.

{¶ 26} Deb Jetter, HOME's Education Coordinator, instructed real estate professionals about fair-housing guidelines. She recommended that real estate agents who were asked about racial composition of neighborhoods refer the client to experts for the information. According to Jetter, the agent's power was limited to listing and selling real estate, and all other questions should be referred. In her position, she instructed agents to avoid making racial-composition statements to reduce malpractice risk.

{¶ 27} William Berger, HOME's Fair Housing Development Specialist, explained that he would provide information about racial diversity to a caller and that real estate agents in the area were trained to tell clients to call HOME for the information.

{¶ 28} Sibcy Cline's vice-president/sales manager, Thomas Hasselbeck, testified that the edition of *Cincinnati Magazine* that provided school diversity figures was sent out in Sibcy Cline's relocation packet. The corporate office compiled the packets of information and often mailed them. He stated that he had been trained not to discuss the racial makeup of a community. He said that it was not illegal to refer clients seeking the racial composition of neighborhoods to other sources, and that agents were encouraged to refer people to HOME.

## II. The Appeal

{¶ 29} The Hannahs' lawsuit alleged breach of contract, breach of fiduciary duty, and fraud. The trial court granted summary judgment to Sibcy Cline and Carroll on all claims. In this appeal, the Hannahs raise four assignments of error. They contend that the trial court violated the Equal Protection Clause of the United States Constitution and the Ohio Constitution in rendering its decision. They also claim that the trial court erred by granting summary judgment on their breach-of-fiduciary-duty and contract claims. In their third assignment, the Hannahs argue that the trial court erred by holding that they

had not suffered any damages. The Hannahs' fourth assignment contends that the trial court erred by granting summary judgment on public-policy grounds.

### A. Summary–Judgment Standard

{¶ 30} Summary judgment is properly awarded if there is no genuine issue of material fact, the movant is entitled to judgment as a matter of law, and it appears from the evidence that reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party.[1] The evidence must be construed in the light most favorable to the nonmovant.[2] And the movant must initially identify that part of the record that demonstrates the absence of a genuine issue of material fact regarding the nonmovant's claim.[3] If that burden is met, the nonmoving party must then set forth specific facts to demonstrate that there is a genuine issue for trial.[4] This court reviews the grant of summary judgment de novo.[5]

### B. No Equal–Protection Violation

{¶ 31} In their first assignment, the Hannahs contend that the trial court violated the Equal Protection Clause of both the United States Constitution and the Ohio Constitution. Both the United States Constitution and the Ohio Constitution forbid the making and enforcing of laws that deny equal protection to those to whom they are made applicable. In other words, "[s]o long as the laws are applicable to all persons under like circumstances and do not subject individuals to an arbitrary exercise of power and operate alike upon all persons similarly situated, it suffices the constitutional prohibition against the equal protection of the laws."[6]

{¶ 32} The Hannahs argue that because the trial court verbally stated (1) that race was different from termites or a faulty furnace and would always be different in this country, and (2) that bigotry went "hand in hand" with being black in this imperfect world, it concluded that R.C. 4735.62(F) and (G) imposed no duty on a real estate agent to inform or provide information to African–

---

1. See *State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 589, 639 N.E.2d 1189, 1192.

2. See *Morris v. Ohio Cas. Ins. Co.* (1988), 35 Ohio St.3d 45, 47, 517 N.E.2d 904, 907.

3. See *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274.

4. See id.

5. See *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 506 N.E.2d 212.

6. See *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 288–289, 595 N.E.2d 862, 866–867, citing *Dayton v. Keys* (1968), 21 Ohio Misc. 105, 114, 50 O.O.2d 29, 252 N.E.2d 655, 660.

Americans about diversity. They also contend that such statements resulted in a decision that African–Americans could not sue for emotional damages caused by bigotry. The Hannahs contend that the trial court's interpretation of the law, as evidenced by its comments, discriminated against them by creating an impermissible race-based classification. The record belies their arguments.

{¶ 33} Contrary to the Hannahs' assertion, the trial court's comments did not create a classification based on race. And "where there is no classification, there is no discrimination that would offend the Equal Protection Clauses of either the United States or Ohio Constitutions."[7]

{¶ 34} The court ruled that the Hannahs had failed to demonstrate that there was a duty for a real estate agent to inform a client whether a neighborhood was ethnically diverse or to direct the client to resources concerning this information. Contrary to the Hannahs' assertion, this ruling was not limited to any particular race, nor was there a difference in the treatment of the Hannahs because of their race. Although the Hannahs happen to be African–American (as was the trial judge), the trial court did not limit its conclusion to African–Americans. Further, the Hannahs' argument wrongly presupposes that only African–Americans would ask questions about the racial composition of a neighborhood and that such inquiry would be for benign purposes only. Although the court's comments may have been ill-advised, they were, when taken in context, no more than offerings of empathy for what the Hannahs had experienced. We overrule the Hannahs' first assignment.

### C. No Fiduciary Duty to Inform of Ethnic Diversity

{¶ 35} In their second assignment, the Hannahs claim that the trial court erred by granting summary judgment on the Hannahs' contract and breach-of-fiduciary-duty claims. We first note that the contract claim was based on a disclosure statement that was executed July 3, 1998. The disclosure agreement stated that Carroll and Sibcy Cline owed to the Hannahs the duties of loyalty, obedience, confidentiality, accounting and reasonable skill and care in performing their duties, as well as the duty to disclose to the Hannahs all material information obtained from the seller or from any other source.

{¶ 36} A real estate broker or salesperson must disclose material facts of the transaction of which the broker or salesperson is aware, or should be aware in the exercise of reasonable skill and care, and that are not confidential pursuant to another agreement.[8] The broker or salesperson must advise a client to get

---

7. See id. at 290, 595 N.E.2d at 868.

8. See R.C. 4735.62(F).

expert advice related to a material matter when necessary or appropriate.[9]

{¶ 37} The evidence before the trial court was that a real estate agent was normally instructed not to discuss the racial composition or diversity of an area. There is no dispute that Carroll informed the Hannahs of this and that they understood this. The reason for the cautious attitude was that such comments could be misconstrued so as to result in claims that an agent had violated the Fair Housing Act.[10] This court has reviewed numerous decisions from both the federal courts and other states' courts concerning the Fair Housing Act, as well as a real estate agent's possible fiduciary duty to disclose information about a neighborhood's racial composition. Nowhere have we found that an agent or broker has the fiduciary duty to disclose such information. In fact, our reading has convinced us that, in order to avoid claims of unlawful steering in violation of the Fair Housing Act,[11] it would not be in the best interests of an agent or broker to do so.

{¶ 38} "Steering" is defined as "the use of word or phrase or action by a real estate broker or salesperson [that] is intended to influence the choice of a prospective property buyer on a racial basis."[12] Some courts have determined that it is irrelevant whether racial information is provided in response to a buyer's question or at the instigation of the broker or agent. Any such discussion may constitute steering.[13] Other courts have determined that buyer-initiated discussions may absolve a real estate agent from any violation.[14] Courts have also looked at the discriminatory effect of a statement and whether it was made with the intent to steer.[15]

{¶ 39} Further, with no clear understanding of what constitutes a satisfactorily diverse neighborhood for a particular client, a real estate agent would be placed in the untenable position of using his or her subjective idea of diversity. An agent acting on his or her idea of ethnic diversity could be accused of steering, or of preserving and encouraging patterns of racial segregation in available

---

9. See R.C. 4735.62(G).

10. Section 3601 et seq., Title 42, U.S.Code.

11. See Section 3604, Title 42, U.S.Code.

12. See *Zuch v. Hussey* (E.D.Mich.1975), 394 F.Supp. 1028, 1047.

13. See *Zuch v. Hussey,* supra.

14. *Heights Comm. Congress v. Hilltop Realty, Inc.* (N.D.Ohio 1983), 629 F.Supp. 1232, affirmed in part and reversed in part (C.A.6, 1985), 774 F.2d 135; *Bellwood v. Dwivedi* (C.A.7, 1990), 895 F.2d 1521.

15. See *Heights Comm. Congress v. Hilltop Realty, Inc.* (C.A.6, 1985), 774 F.2d 135, 140.

housing, by not showing a minority client either a predominantly white or a predominantly African–American neighborhood.

{¶ 40}   We hesitate to impose a duty on real estate agents to disclose the racial composition or ethnic diversity of a neighborhood to a potential buyer when the buyer requests such information, because the obligation could conflict with the Fair Housing Act. A November 8, 1996 opinion letter from the Department of Housing and Urban Development, which administers the Fair Housing Act, supports our conclusion.[16]   We note that the letter was the second of three written by the Office of the Assistant Secretary for Fair Housing and Equal Opportunity, under the auspices of the Department of Housing and Urban Development.   The first letter stated that a buyer's agent could show houses in white-only neighborhoods, if requested to do so by a buyer, without violating the Fair Housing Act.[17]   A third letter rescinded the first letter with promises of developing comprehensive guidelines.[18]   We have been unable to ascertain the existence of such guidelines.

{¶ 41}   In the November 1996 letter, the Assistant Secretary answered a request for an opinion on the legal import of an exclusive buyer's agent accommodating a buyer who indicated a preference for housing on a racial basis. The Assistant Secretary emphasized that her response was reflective of only the posed hypothetical and was not a final policy on general issues.   The letter strongly advised against accommodating such a request.   It stated that there was nothing in the Fair Housing Act that required an agent to accommodate an expressed desire to limit a housing search based on race, and that to do so would reflect a conscious decision by a broker.   It explained, "[P]roof that an individual buyer, without encouragement or solicitation, insisted on such a limitation as a condition of the agent receiving the buyer's business would be fact intensive and require extensive investigation involving not only the agent but the buyer. Moreover, the investigation would necessarily require inquiry into the agent's practices (in what manner do they maintain and make available location records based on race as part of their service?) and any independent judgments that the agent might have made in accommodating the request (what racial composition caused a particularly [sic] neighborhood determined to be appropriate for inclusion/exclusion from the search?)."

{¶ 42}   Therefore, the Assistant Secretary of Fair Housing and Equal Opportunity concluded, "In short, from the standpoint of legally prudent, as well as

---

16.   See Real Estate Intelligence Report (Nov. 1996), at 4.

17.   See Real Estate Intelligence Report (Oct. 1996), at 4.

18.   See Real Estate Intelligence Report (Winter 1997), at 3.

ethical considerations, I would strongly advise against any agent or broker putting themselves in that position by accommodating a request that a housing search be limited based on race, or other protected-class terms." This letter demonstrates that if a buyer's agent accommodates a buyer's request, the agent will have a heavy burden of proving that the request was made independently from any action by the agent.

{¶ 43} We also conclude that the record fails to demonstrate that Carroll or Sibcy Cline knew of the ethnic composition of any neighborhood or should have had such information in light of the impropriety of providing the information to clients. Thus, we conclude that, as a matter of law, there was no fiduciary duty to tell the Hannahs the racial composition of any neighborhood, nor was there a breach of contract for failing to disclose the racial composition of any neighborhood.

### 1. The HUD Letter Is Not Hearsay

{¶ 44} The Hannahs also challenge the trial court's consideration of the letter from the Department of Housing and Urban Development. We conclude that the letter was not hearsay, but was more analogous to an opinion letter of an attorney general, legislative history of a statute, or any number of aids used by courts to resolve various legal questions. The trial court used the letter not to determine factual issues, but to aid it in determining how a real estate agent or broker should respond to a buyer's request for racial information concerning a neighborhood. And we ourselves have quoted from the letter. But even were the letter hearsay, we cannot conclude that the trial court's consideration was prejudicial because there is no fiduciary duty to disclose the racial composition of a neighborhood to a buyer. The answer is the same with or without the letter.

### 2. Summary Judgment Was Based on Argued Issues

{¶ 45} The Hannahs next argue that the trial court granted summary judgment on a basis that the parties had neither briefed nor argued. The trial court stated that the gist of the Hannahs' complaint was that Carroll and Sibcy Cline had failed to recommend a neighborhood that was ethnically diverse enough to satisfy their preferences. The Hannahs claim that the basis of the trial court's decision was wrong because they did not ask Carroll or Sibcy Cline to recommend a neighborhood. They only asked for diversity information or to be directed to a resource for that information. We find no merit to this argument. The trial court's statement, when viewed in the context of its verbal decision, demonstrates that the court based its decision on whether Carroll and Sibcy Cline owed the Hannahs a fiduciary duty to provide information about the racial

diversity of an area or to direct them to any particular agency for that information.

### D. No Fiduciary Duty to Direct Clients to Resources for Diversity Information

{¶ 46}   The Hannahs argue that the trial court erred by finding that Sibcy Cline and Carroll had no duty to direct the Hannahs to diversity experts. There were several witnesses who said that they would have directed the Hannahs to HOME or to other places for information concerning the racial composition of neighborhoods, and that real estate personnel in the area were trained to do so. The Hannahs' expert testified that she felt that the fiduciary duty "was not accomplished" because the Hannahs were not directed to such sources as the Chamber of Commerce, HOME, or the public library to help them find the information, even though she was not sure that resources other than HOME would actually have had the information. She testified that there was no "absolute" source for clients, but that there was a multitude of sources. Carroll did direct the Hannahs to the schools for information about ethnic diversity. The trial court determined that there was no evidence to support a duty or a standard to refer clients to experts when the issue raised was ethnic diversity.

{¶ 47}   A real estate salesperson or broker must advise a client to seek expert advice related to material matters when necessary or appropriate.[19]   But the statute does not necessarily require an agent or broker to direct a client to the expert or give the client a name of an expert. The disclosure agreement in this case reflected this limited duty by stating that Carroll and Sibcy Cline had a "duty to disclose to the buyer all material information obtained from the seller or from any other source."

{¶ 48}   First, we conclude that Carroll and Sibcy Cline did not breach the contract, because the record fails to demonstrate that they had obtained the statistical information from any source or that they should have had the information.

{¶ 49}   The fiduciary duty imposed by statute on an agent or broker is to advise a client to *obtain* expert advice for material matters when *necessary* or *appropriate*.   First, this duty does not by its terms require an agent or broker to do more than tell a client that it would be in his or her best interest to seek expert advice. There is no duty to tell the client whom to contact, only that there is a need to do so.

---

19.   See R.C. 4735.62(G).

{¶ 50} With the knowledge that Carroll could not give them information about the racial composition of a neighborhood, it would seem obvious that, if the information was important to them, the Hannahs should have known that they needed to locate resources other than Carroll, without it being *necessary* or *appropriate* for Carroll to tell them to do so. Second, the record demonstrates that there were other resources available to the Hannahs, and that they were able to find them on their own when seeking their second Cincinnati home. This supports the conclusion that it was not necessary for Carroll to provide the resources. (Although the Hannahs did not discover HOME on their own, the Hannahs' own expert testified that HOME was not the only resource.)

■ {¶ 51} We conclude that, as a matter of law, a real estate agent or broker has no *fiduciary* duty to direct a client to resources that keep diversity information. The record demonstrates that an agent or broker may choose to do so. In this case, Carroll chose to direct the Hannahs to local schools. There was evidence that schools were a good source of ethnic-diversity information concerning their students and the surrounding areas in which their students lived, but that they might not be a good indicator of a particular neighborhood. Zondra also spoke to neighbors when she looked at the Milford home. Construing the evidence most favorably to the Hannahs, we conclude that the Hannahs failed to demonstrate that Carroll and Sibcy Cline breached a duty to advise the Hannahs to seek expert advice on diversity.

{¶ 52} The Hannahs argue that the trial court also erred when it imposed on them the duty to exercise reasonable diligence concerning information about diversity in relation to their breach-of-fiduciary-duty claim. The fact that information was equally available to the Hannahs and to Carroll and Sibcy Cline was pertinent to determine whether it was necessary or appropriate to advise the Hannahs to seek expert advice on diversity. We overrule the Hannahs' second assignment.

### E. The Trial Court Properly Refused to Award Damages

{¶ 53} In their third assignment, the Hannahs challenge the trial court's determination that the Hannahs did not suffer any damages. Because we have concluded that the trial court properly granted summary judgment to Carroll and Sibcy Cline on the Hannahs' contract and breach-of-fiduciary-duty claims, we need not address the damages issues for those claims.

■ {¶ 54} The Hannahs also claim that the trial court erred in concluding that they suffered no economic or noneconomic damages on their fraud claim. The Hannahs based their fraud claim on the allegation that one day after they had signed an offer to buy the house in Milford, Carroll told them that she had

sold a house in Milford to a black family and that the family had been happy in Milford. Carroll disputed that she said the family was black. Construing the evidence most favorably for the Hannahs, and thus accepting their statements as to the substance of Carroll's statement, we assume that Carroll did say that the family was African–American.

{¶ 55} To demonstrate fraud, the Hannahs had the burden to show that Carroll made a false representation material to the sale of the Milford home with the intent to mislead the Hannahs into relying on the statement, and that the Hannahs justifiably relied on the statement and suffered injury proximately caused by the reliance.[20]

{¶ 56} The Hannahs made an offer to purchase the Milford home on July 4. Carroll allegedly made the false representation on July 5. The Hannahs claimed that the negotiations continued because of the representation. Zondra testified in her deposition that she told Carroll that she was unsure about the Milford house because they "did not know if Milford was an ethnically diverse neighborhood," and they "did not know about the schools." Carroll responded that she had their best interests at heart and that their family would be happy in Milford. Zondra stated that she did not want her family to experience any racial animosity. At that point, Carroll told her that she had sold a home in Milford to an African–American family, who had been very happy there. Negotiations continued until July 12, when the contract was signed by the Hannahs and the sellers.

{¶ 57} What was material to the transaction, according to the Hannahs, was the ethnic diversity of Milford and its school district. In the context of their fraud claim, the Hannahs took this misrepresentation as a guarantee that Milford and its schools were diverse, and that they would be happy in Milford.

{¶ 58} According to Zondra, Carroll had told the Hannahs that the one African–American family's preschool child attended a private preschool. The Hannahs could not have justifiably relied on the misrepresentation that Carroll had sold a home in Milford to an African–American family, and that the Milford public schools were ethnically diverse. Further, the Hannahs were not justified in relying on the statement that one black family had moved to Milford and was happy as a representation that Milford was ethnically diverse and that they would be happy. Happiness is difficult to guarantee.

{¶ 59} The Hannahs were looking for a house in an "ethnically diverse" area. They never specified what their subjective definition of ethnic diversity meant. Also, the fact that one African–American family was "happy" and, implicitly, had

---

**20.** See *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 475, 700 N.E.2d 859, 868.

not experienced racial animosity did not necessarily mean another family would have the same experience. "Happiness" is so subjective as to be almost meaningless in this context. And even had there been justifiable reliance, the record fails to demonstrate that the harassment of the Hannahs' children at school and the stares from employees at a restaurant were causally linked to the reliance. Thus, because the trial court properly granted summary judgment on the Hannahs' fraud claim, they were not entitled to any damages.

### F. The Trial Court Did Not Base Its Decision on Public Policy

{¶ 60}   In their last assignment, the Hannahs argue that the trial court erred by granting summary judgment to Carroll and Sibcy Cline based on their argument that Symmes Township, the area to which the Hannahs moved, had an African–American population of only 4.2 percent compared to Milford's 1.5 percent African–American population. The record fails to demonstrate that the trial court "based" its decision on that fact. What the court did say was that the two communities "looked alike on paper," but that Symmes Township must have had a different feel in that the Hannahs felt more welcomed there. We find no merit in the Hannahs' last assignment.

### III.   Conclusion

{¶ 61}   While we empathize with the negative experiences of the Hannahs and fervently wish that all neighborhoods and communities would be accommodating to all who choose to live in them, we are a court of law and our duty—and our ability—is limited to correcting legal wrongs, not social wrongs.

{¶ 62}   We also believe that imposing a duty on real estate agents or brokers to give information about the ethnic makeup of a neighborhood, even for benign purposes such as those here, would prove detrimental to the goal of fair housing. History belies the wish that such information would normally be used as the Hannahs wished to use it. Because we conclude that the trial court properly granted summary judgment on the Hannahs' claims, we affirm its judgment.

Judgment affirmed.

HILDEBRANDT, P.J., and WINKLER, J., concur.