[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[1] Due to a settlement, an agreed entry of partial dismissal with prejudice was filed on December 18, 2002. According to the trial court's entry, the defendants that remain in the case are Re/Max Home-Mart, Barb Carney, Neal Rakstang, and Associates Home Equity Services, Inc.
 DECISION.
{¶ 1} Plaintiff-appellants, Liz and Jamie Nunez and their minor child Jacob (collectively, "the Nunezes"), appeal the summary judgment granted by the Hamilton County Court of Common Pleas in favor of the defendants-appellees, Ford Consumer Finance Company, Inc., n.k.a. Associates Home Equity Services, Inc. ("Associates"), Re/Max Home-Mart ("Re/Max"), Barb Carney and Neal Rakstang. We affirm the judgment of the trial court.
 {¶ 2} The controversy primarily concerns whether required federal lead-based-paint disclosures were made by the defendants-appellees ("the sellers") to the Nunezes before the Nunezes were bound by a contract to purchase a residence at 124 South Wayne Avenue ("the residence") and the consequences for the sellers from the alleged failure to meet the disclosure obligations. The federal regulatory violations claimed by the Nunezes were promulgated pursuant to a directive in Section 4852d, Title 42, U.S. Code, which codified Congressional enactment of the Residential Lead-Based Paint Hazard Reduction Act. On December 5, 1996, the Nunezes made an initial $75,000 offer to purchase the residence, and the sellers rejected it. Next, the sellers extended a $79,000 counteroffer to the Nunezes. The Nunezes accepted the counteroffer on December 6, 1996. It is axiomatic that the formation of a contract is dependent upon both an offer on the one side and an acceptance on the other[2]; thus, the contract date was December 6. According to the record, Re/Max and its agents, Carney and Rakstang, represented both the sellers and the Nunezes under a dual-agency agreement. The closing occurred on December 19, 1996, and the Nunezes moved into the residence the next month.
 {¶ 3} After having lived in the residence for approximately six months, the parents sought medical testing to determine whether their children, including Jacob, had elevated levels of lead in their blood, which they did. The children underwent medical treatment to reduce the elevated levels of lead and to address the permanent harm that was characteristic of lead exposure. After the children's medical tests showed elevated levels of lead in their blood, a Cincinnati Health Department employee inspected and tested for lead hazards at both the newly purchased residence and the Nunezes' former residence on Anthony Wayne Avenue, which they still owned. The report, dated July 31, 1997, issued by the employee, a licensed lead-risk assessor, contained a finding that exterior and interior lead hazards were present at both residences and that the violations required abatement by state-licensed contractors, in accordance with state requirements.
 {¶ 4} The trial court granted summary judgment against the Nunezes on their 28-count complaint, which alleged federal lead-based-paint-hazard regulatory violations, fraudulent and negligent misrepresentation, breaches of contract and fiduciary duty, and negligence and negligence per se. On appeal the Nunezes now raise two assignments of error: that the trial court erred by granting summary judgment (1) in favor of Associates and Re/Max, and (2) in favor of Carney, Rakstang, and Re/Max. Because the arguments advanced by the Nunezes in support of the assignments of error are so interrelated, we address them as they implicate the various counts in the complaint. Claims asserted in counts numbered 1, 2, 3, and 26 of the complaint are not discussed because of the partial settlement.
 {¶ 5} Summary judgment is proper, given adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, on which the party will bear the burden of proof at trial.[3] Pursuant to Civ.R.56(C), a motion for summary judgment is to be granted only when no genuine issue of material fact remains to be litigated, the moving party is entitled to judgment as a matter of law, and it appears from the evidence that reasonable minds can come to but one conclusion, and, with the evidence construed most strongly in favor of the nonmoving party, that conclusion is adverse to that party.[4] The party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists, and once it has satisfied its burden, the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial.[5] An appellate court reviews a trial court's decision on a motion for summary judgment de novo.[6]
 {¶ 6} In their complaint, the Nunezes alleged that the disclosures that were not made by the sellers pertaining to hazards posed by lead-based paint were required under Section 745.107, Title 40, C.F.R. The Nunezes also pointed out another failure on the part of the sellers under the same regulation: "If any of the disclosure activities identified in paragraph (a) of this section occurs after the purchaser or lessee has provided an offer to purchase or lease the housing, the seller or lessor shall complete the required disclosure activities prior to accepting the purchaser's or lessee's offer and allow the purchaser or lessee an opportunity to review the information and possibly amend the offer."[7]
 {¶ 7} While it was not addressed by the Nunezes in their complaint, in reading this regulation, we note that it further provides, "Nothing in this section implies a positive obligation on the seller or lessor to conduct any evaluation or reduction activities," and that while it identifies a particular pamphlet approved by the Environmental Protection Agency ("EPA") to be furnished to a prospective buyer, the regulation permits the furnishing of "an equivalent pamphlet that has been approved for use in that State by EPA."[8]
 {¶ 8} The Nunezes claimed damages in counts 4 through 11 of their complaint pursuant to Section 745.118(c), which provides, "Any person [who] knowingly violates the provisions of this subpart shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual."[9]
 {¶ 9} In counts 4 through 9, the Nunezes alleged a failure on the part of all the sellers stemming from their knowing violation of the certification-and-acknowledgment disclosure requirements of Sections 745.113(a)(4) and (a)(2), Title 40, C.F.R.
 {¶ 10} Section 745.113(a)(4) requires that the following be provided in connection with the sale of residential property: "(4) A statement by the purchaser affirming receipt of the information set out in paragraphs (a)(2) and (a)(3) of this section and the lead hazard information pamphlet required under 15 U.S.C. § 2696."
 {¶ 11} With respect to Section 745.113(a)(2) and (a)(3), the following are required: "(2) A statement by the seller disclosing the presence of known lead-based paint and/or lead-based paint hazards in the target housing being sold or indicating no knowledge of the presence of lead-based paint and/or lead-based paint hazards. The seller shall also provide any additional information available concerning the known lead-based paint and/or lead-based paint hazards, such as the basis for the determination that lead-based paint and/or lead-based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards, and the condition of the painted surfaces"; and "(3) A list of any records or reports available to the seller pertaining to lead-based paint and/or lead-based paint hazards in the housing that have been provided to the purchaser. If no such records or reports are available, the seller shall so indicate."
 {¶ 12} In counts 10 and 11, the Nunezes alleged that because Carney, Rakstang, and Re/Max, acting as agents of Associates, "knowingly and deliberately failed to ensure compliance with all the requirements of 40 C.F.R. § 745 et seq.," they violated all of the agent responsibilities of Section 745.115, Title 40, C.F.R. This latter section imposes upon the agent a duty to inform the seller of his obligations under Section 745.107 et seq., Title 40, C.F.R. and to further ensure that the seller has performed all the obligations or to personally ensure compliance. If the agent has complied with these requirements, then the agent cannot be liable for lead-based paint hazards known by a seller but not disclosed to the agent.
 {¶ 13} After our review of the record and the evidence advanced by the sellers, we hold that reasonable minds could only conclude that there was no knowing violation of any of the disclosure requirements by any of the sellers. Associates originally acquired the residence in a foreclosure proceeding and listed it for sale "as is," except for roof repairs. The listing agent was Rakstang, who put out a sale sign on December 5, 1996. That same day, Mrs. Nunez drove by the property and promptly made an inquiry about it. Because Rakstang was unavailable, Carney agreed to meet Mr. and Mrs. Nunez at the residence, also on that same day. The Nunezes viewed the exterior and interior of the residence, which revealed that work needed to be done. According to the record, there was agreement that Carney never told the Nunezes that the residence was free of lead-based paint. Moreover, none of the sellers had knowledge of any reports or tests that had ever been performed to determine whether lead-based paint was present in the residence. This is not a case where reports showing the presence of lead hazards were never given to prospective buyers.[10] Because Mr. Nunez saw no need for a professional home inspection prior to purchasing the Anthony Wayne Avenue residence in 1994 (he realized that anything an inspector would do, he could do himself), Mr. Nunez did not intend to pay for any inspection on the residence being shown by Carney and waived his opportunity to have inspections done.
 {¶ 14} The Nunezes' depositions show that there was no dispute about whether they received printed information about lead-based paint hazards prior to being bound by the contract or that they waived their opportunity for inspections for such hazards. While it is true that the EPA pamphlet specifically identified in the federal regulations was not given to the Nunezes, they were told by Carney that she did not have one with her; but she did furnish other information about lead-based paint hazards and the importance of residential property inspections. The extreme danger posed to children by lead-based paint hazards and the overwhelming likelihood of its presence in pre-1978 residences could not have been more explicit in the document that was titled, "Lead-Based Paint Disclosure." Under the heading "Lead Warning Statement," it read, "Every buyer of any interest in residential real property on which a residential dwelling unit was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase."
 {¶ 15} Mr. Nunez admitted that he signed this document, among others, upon acceptance of the counteroffer and prior to closing. Another document furnished to the Nunezes was titled "U.S. Department of Housing and Urban Development Notice to Purchasers and Renters of Housing Constructed Before 1978" and in bold letters immediately below the title appeared the warning "WATCH OUT FOR LEAD-BASED PAINT POISONING!" The ensuing sentence read, "If the home you intend to purchase or rent was built before 1978, it may contain lead-based paint. About three out of every four pre-1978 buildings have lead-based paint." Immediately below this in bold, blocked-off lettering was, "YOU NEED TO READ THIS NOTICE ABOUT LEAD." And immediately under this appeared a category called "What is Lead Poisoning?" It read, "Lead poisoning means having high concentrations of lead in the body. LEAD CAN: Cause major health problems, especially in children under 7 years old. Damage a child's brain, nervous system, kidneys, hearing or coordination. Affect learning. Cause behavior problems, blindness, and even death. Cause problems in pregnancy and affect a baby's normal development." The record shows that Mr. Nunez signed the acknowledgement on this document which read, "I acknowledge that I have received and read a copy of this Notice before signing the sales contract to purchase my property." On this record, reasonable minds could only conclude that there were no knowing federal regulatory violations committed by the sellers.
 {¶ 16} The Nunezes' complaint also included misrepresentation claims, both fraudulent and negligent, which we consider together. In counts 12, 13, and 14, the Nunezes alleged common-law fraudulent misrepresentation by Carney, Re/Max, and Associates on the basis of one statement, taken out of context, made by Carney on December 5, 1996. According to the Nunezes, Carney said that it would have been a "waste of time and money" to have the residence inspected. In an action for fraudulent misrepresentation, the plaintiff must prove, by a preponderance of the evidence, each of the following elements: (a) a representation or, where there is a duty to disclose, concealment of a fact, which (b) is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.[11]
 {¶ 17} When a plaintiff claiming fraud in the sale of property has had the opportunity to inspect the property, he is charged with knowledge of the conditions that a reasonable inspection would have disclosed.[12]
A non-disclosure by the seller of a home cannot rise to the level of fraud unless the defect was latent, i.e., it could not have been detected by inspection.[13] Moreover, the doctrine of caveat emptor precludes recovery in an action by the purchaser for a structural defect in real estate where (1) the condition complained of is open to observation or discoverable upon reasonable inspection; (2) the purchaser had the unimpeded opportunity to examine the premises; and (3) there is no fraud on the part of the vendor.[14] We note that there is an Ohio statute that requires sellers of Ohio residential real estate to provide various residential property disclosures, and that imposes a duty upon a seller to disclose known defects, but even this statute has not eliminated the common-law doctrine of caveat emptor.[15] The federal regulations at issue in this case read as follows: "Nothing in this section implies a positive obligation on the seller or lessor to conduct any evaluation or reduction activities."[16] There is nothing in the record to show that the Nunezes were barred from making any inspections they desired.
 {¶ 18} In counts 15, 16, and 17, the Nunezes allege common-law negligent misrepresentation by Carney, Re/Max, and Associates for the same December 5 statement identified in counts 12, 13, and 14. The elements of negligent misrepresentation are as follows: "One who, in the course of his business, profession, or employment * * * supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communication the information."[17]
 {¶ 19} With regard to fraud, there is nothing in the record to indicate that the sellers committed fraud because the Nunezes advanced no evidence showing that anyone made misrepresentations with knowledge of their falsity or with such disregard that knowledge could be inferred, with an intent to mislead the Nunezes into relying upon them. The record shows that the Nunezes were told by Carney that she did not have any reports of inspections for the presence of lead paint in the residence and did not know if there were any, that no inspection would be done at the seller's expense, and that the residence had been constructed prior to 1978 so the presence of lead paint contamination was a possibility. Moreover, the residence was to be sold "as is," regardless of the presence of lead paint or any other defect, excepting the roof repair, that a buyer-paid-for inspection would disclose. When Mrs. Nunez was asked specifically what Carney had said to her about the inspections she replied, "She said it would be a waste of time and money to get an inspection because Ford [Associates] wasn't going to pay for anything." And when asked if regardless of whether [Associates] was going to pay for any defects that were discovered in the house, the Nunezes still could have had an inspection done and then made the decision whether to go forward with the house purchase, Mrs. Nunez replied, "Yes," and further confirmed that at the time they first viewed the residence on December 5, they had chosen not to have an inspection done. Mrs. Nunez also stated when deposed that she never spoke with a representative from Associates prior to December 19, when the closing occurred. In her deposition, she further confirmed that almost every room in the residence had peeling paint that was observed on December 5, and that the chips, if eaten by her children, could have proved hazardous to them. Reasonable minds could only conclude that there were no misrepresentations made by the sellers.
 {¶ 20} In counts 20 and 21, the Nunezes alleged common-law negligence by Carney, Rakstang, and ReMax. In order to defeat a motion for summary judgment on a negligence claim, a plaintiff must point to genuine issues of material fact concerning whether (1) the defendant owed a duty of care; (2) the defendant breached that duty; and (3) the breach was the proximate cause of plaintiff's injury.[18] Issues of comparative negligence are for the jury to resolve unless the evidence is so compelling that reasonable minds can reach but one conclusion.[19]
Under the comparative-negligence statute, the factfinder apportions the percentage of each party's negligence that proximately caused the plaintiff's damages.[20] A plaintiff may recover where his contributory negligence is equal to or less than the combined negligence of all the defendants.[21] Tort claims based upon the same actions underlying a breach-of-contract claim are viable only if the breaching party has also breached a duty owed separately from the duty created by the contract, that is, a duty owed even if no contract existed.[22] A defendant's duty to a plaintiff depends upon the relationship between the parties and the foreseeability of injury to someone in the plaintiff's position.[23]
Injury is foreseeable if a defendant knew or should have known that its actions were likely to result in harm to someone.[24]
 {¶ 21} The Nunezes have failed to identify anywhere in the record what duties of care they believe were breached to support their common-law claim of negligence against Re/Max, Carney and Rakstang, other than that of the alleged failure to make required lead-based paint disclosures, which we have already rejected. At this time, there is no statutory or common-law requirement that a seller conduct an inspection of his property at his own expense before offering it for sale. In fact, even under the federal regulations that the Nunezes claim are applicable, there is no positive obligation on the seller to conduct any lead-based-paint evaluation prior to a sale.[25] Disclosure is mandatory for only those real-estate defects within a seller's actual knowledge, and in this instance none of the sellers had actual knowledge of lead-based hazards. Moreover, the Nunezes were certainly not barred from hiring an inspector at their own expense to conduct whatever kind of investigation they considered appropriate in the circumstances. Even if some duty beyond that of contract existed, as a matter of law, reasonable minds could not have concluded that the sellers had proximately caused injury to the Nunezes.[26] The record shows that information about lead-based-paint hazards was given to the Nunezes and read in part prior to their being bound by contract, but that they chose to proceed with the closing, waiving their opportunity to have the residence inspected and ignoring the great likelihood of lead-based-paint hazards as laid out in the lead-based-paint hazard information that they were given by Carney.
 {¶ 22} They were told that this was a pre-1978 residence, and they received information titled, "U.S. Department of Housing and Urban Development Notice to Purchasers and Renters of Housing Constructed Before 1978," which warned them in bold letters "WATCH OUT FOR LEAD-BASED PAINT POISONING!" The first sentence read, "If the home you intend to purchase or rent was built before 1978, it may contain lead-based paint. About three out of every four pre-1978 buildings have lead-based paint." Under the very first category called "What is Lead Poisoning?" was this language: Lead poisoning means having high concentrations of lead in the body. LEAD CAN: Cause major health problems, especially in children under 7 years old. * * *." The Nunezes chose to ignore what the document alarmingly laid out about lead poisoning, with subtitles such as "What is Lead Poisoning," "Who Gets Lead Poisoning," "Where Does it Come From," How Do I Know If My Child Is Affected?", "What Can I Do About It?", "How Do I Know If My Home Has Lead-Based Paint?", "What Do I Do If My HomeDoes Have Lead?". Similar warnings were contained in the "Lead-Based Paint Disclosure" form under the heading "Lead Warning Statement," which the Nunezes received prior to being bound by contract.
 {¶ 23} The Nunezes, instead, were confident in Mr. Nunez's expertise to perform his own investigations based on their prior experience with home inspectors. Reasonable minds could have only concluded that there was no negligence on the part of the sellers that proximately caused injury to the Nunezes.
 {¶ 24} In counts 22 and 23 the Nunezes alleged breach of contract by Carney, Rakstang, and Re/Max, and in counts 18 and 19, they alleged breach of fiduciary duty. For a valid contract to exist, there must be an offer on one side, an acceptance on the other side, and mutual assent between the parties with regard to the consideration for the bargain. In this case, the record includes a dual-agency agreement that identified Re/Max Home-Mart and its agents Carney and Rakstang as representing both the buyer and the seller; thus, there was a fiduciary relationship.[27]
A real estate broker or salesperson must disclose material facts of the transaction of which the broker or salesperson is aware, or should be aware in the exercise of reasonable skill and care, and that are not confidential pursuant to another agreement.[28] With regard to the contract claims, on this record, the sellers disclosed everything that they had actual knowledge of with respect to the presence of lead hazards, including that the residence was of an age where such hazards were likely present, and they had no duty to perform any inspections prior to offering the property for sale. The Nunezes were free to conduct any buyer-paid-for inspections they wished. Reasonable minds could have only concluded that the Nunezes were not the victims of either a breach of contract or a breach of a fiduciary duty.
 {¶ 25} The Nunezes alleged negligence per se by Carney, Rakstang, Re/Max, and Associates in counts 24 and 25. In their complaint, they cited to the "Federal Residential Lead-Based Paint Hazard Reduction Act (40 C.F.R. § 745.113 et seq.)" that imposed specific duties upon the sellers who "breached these specific safety requirements contained in the regulations and this constitutes negligence per se."
 {¶ 26} The Ohio Supreme Court has distinguished rulemaking from lawmaking in the application of negligence per se, stating that strict compliance with a multitude of rules put forth by administrative agencies would be virtually impossible and would open the floodgates to litigation.[29] Even if a negligence-per-se analysis was applicable in this case, the violations claimed by the Nunezes would not have survived scrutiny as a matter of law. We note that the Ohio Supreme Court has distinguished negligence per se from negligence as follows: "Where there exists a legislative enactment commanding or prohibiting for the safety of others the doing of a specific act and there is a violation of such enactment solely by one whose duty it is to obey it, such violation constitutes negligence per se; but where there exists a legislative enactment expressing for the safety of others, in general or abstract terms, a rule of conduct, negligence per se has no application and liability must be determined by the application of the test of due care as exercised by a reasonably prudent person under the circumstances of the case."[30] The Ohio Supreme Court has rejected a claim of negligence per se for the violation of a state statute that imposed no fixed and absolute duty that was the same under all circumstances, but rather left to the trier of fact a determination from all of the facts and circumstances of each particular case whether the alleged violator acted as a reasonably prudent person would have and that left the determination whether a violation had occurred to the consideration of more than a single issue of fact.[31]
 {¶ 27} In this case, more than a single issue of fact had to be considered before a determination could be made whether the regulations in Section 745.107 et seq., Title 40, C.F.R. issued pursuant to the Residential Lead-Based Paint Hazard Reduction Act of 1992,[32] had been violated. Among other things, the conduct at issue required a determination by a trier of fact whether any person had "knowingly" violated the duties imposed for the disclosure of lead-based-paint hazards; whether some other equivalent pamphlet approved by the EPA for use in one's state was given to the potential buyer if the EPA document identified in the regulations was not; whether the potential buyer waived his opportunity to conduct a risk assessment or inspection; and whether the waiver was properly documented. Clearly the consideration of more than just one fact, the commission or omission of a specific act prohibited or required, would have been required.[33] In light of this, we cannot hold that the Nunezes' claimed regulatory violations, even if identical to violations of the federal statute, could have provided a basis for the application of negligence per se. Because negligence per se had no application in this case, the trial court did not err in granting summary judgment on these claims.
 {¶ 28} In sum, because reasonable minds could have only concluded that the Nunezes could not recover on any of their federal regulatory, tort or contract claims, the trial court did not err when it granted summary judgment in favor of the sellers, and, accordingly, the loss-of-consortium and punitive-damages counts in the complaint need not be addressed on appeal.
 {¶ 29} Therefore, the Nunezes' two assignments of error are overruled, and the trial court's judgment is affirmed.
Judgment affirmed.
Doan, P.J., and Painter, J., concur.
[2] See Univ. Hosps. of Cleveland, Inc. v. Lynch, 96 Ohio St.3d 118,130, 2002-Ohio-3748, 772 N.E.2d 105, at ¶ 62.
[3] See Celotex Corp. v. Catrett (1986), 477 U.S. 317, 322-323,106 S.Ct. 2548.
[4] See Armstrong v. Best Buy Co., Inc., 99 Ohio St.3d 79,2003-Ohio-2573, 788.E.2d 1088, at ¶ 15, citing Horton v. HarwickChem. Corp. (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus; State ex rel. Howard v. Ferreri, 70 Ohio St.3d 587,589, 1994-Ohio-130, 639 N.E.2d 1189.
[5] See Dresher v. Burt, 75 Ohio St.3d 280, 293, 1996-Ohio-107,662 N.E.2d 264.
[6] See Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105,671 N.E.2d 241.
[7] See Section 745.107(b), Title 40, C.F.R. 
[8] See Sections 745.107(a) and (a)(1), Title 40, C.F.R. 
[9] See Section 745.118(c), Title 40, C.F.R. (emphasis added). While definitions appear in Section 745.103, "knowingly" is not included among them.
[10] See Smith v. Coldwell Banker Real Estate Servs. (D.Conn. 1999),122 F. Supp.2d 267 (defendant sellers obtained a lead-based-paint report that was not provided to plaintiffs until closing; plaintiff's motion for summary judgment granted, in part, as to liability with respect to agent and real estate company, and trial had on liability of defendant sellers and damages as to all defendants).
[11] See Cohen v. Lamko, Inc. (1984), 10 Ohio St.3d 167, 169,462 N.E.2d 407; Kelley v. Ford Motor Credit Co. (2000), 137 Ohio App.3d 12,16, 738 N.E.2d 9; Rose v. Zaring Homes, Inc. (1997), 122 Ohio App.3d 739,743-744, 702 N.E.2d 952, discretionary appeal not allowed (1998),81 Ohio St.3d 1421, 688 N.E.2d 1046.
[12] See Eiland v. Coldwell Banker Hunter Realty (1997),122 Ohio App.3d 446, 459, 702 N.E.2d 116.
[13] See Layman v. Binns (1988), 35 Ohio St.3d 176, 178,519 N.E.2d 642.
[14] See id., syllabus.
[15] See R.C. 5302.30; Rogers v. Hill (1998), 124 Ohio App.3d 468,471, 706 N.E.2d 438; Masten v. Brenick, 4th Dist. No. 99CA8, 2001-Ohio-2500. According to Carney's deposition of March 16, 2000, such a disclosure form was not prepared.
[16] See Section 745.107(a), Title 40, C.F.R. 
[17] See Delman v. Cleveland Heights (1989), 41 Ohio St.3d 1, 4,534 N.E.2d 835.
[18] See Texler v. D.O. Summers Cleaners Shirt Laundry Co.,81 Ohio St.3d 677, 680, 1998-Ohio-602, 693 N.E.2d 271; Second Natl. Bankof Warren v. Demshar (1997), 124 Ohio App.3d 645, 648, 707 N.E.2d 30.
[19] Simmers v. Bentley Constr. Co., 64 Ohio St.3d 642, 646,1992-Ohio-42, 597 N.E.2d 504.
[20] Id., citing R.C. 2315.19(B), R.C. 2315.19 applied to causes of action which accrued prior to April 9, 2003.
[21] Id., citing R.C. 2315.19(A)(2).
[22] See Textron Fin. Corp. v. Nationwide Mut. Ins. Co. (1996),115 Ohio App.3d 137, 151, 684 N.E.2d 1261, discretionary appeal not allowed in (1997), 78 Ohio St.3d 1425, 676 N.E.2d 531.
[23] See Simmers v. Bentley Constr. Co., 64 Ohio St.3d 642, 645,1992-Ohio-42, 597 N.E.2d 504.
[24] See id.
[25] See Section 745.107(a), Title 40, C.F.R. 
[26] See Simmers, supra, at 646, 1992-Ohio-42, 597 N.E.2d 504 ("Issues of comparative negligence are for the jury to resolve unless the evidence is so compelling that reasonable minds can reach but one conclusion."); see, also, Texler, supra, at 681, 1998-Ohio-602, 693 N.E.2d 271.
[27] See R.C. 4735.62 and 4735.70(A); Hannah v. Sibcy Cline Realtors,147 Ohio App.3d 198, 208-209, 2001-Ohio-3912, 769 N.E.2d 876, appeal denied by 95 Ohio St.3d 1436, 766 N.E.2d 1002, reconsideration denied by95 Ohio St.3d 1488, 769 N.E.2d 403.
[28] See R.C. 4735.62(F).
[29] See Chambers v. St. Mary's School, 82 Ohio St.3d 563, 567-568,1998-Ohio-184, 697 N.E.2d 198.
[30] See Eisenhuth v. Moneyhon (1954), 161 Ohio St. 367, 119 N.E.2d 440, paragraph three of the syllabus; Becker v. Shaull (1992), 62 Ohio St.3d 480,484, 584 N.E.2d 684 (a violation of R.C. 5589.06, diversion of water from adjacent lands to or upon a public highway, not negligence per se).
[31] Id. at 483-484, 584 N.E.2d 684; see, also, Westervelt v. Rooker
(1983), 4 Ohio St.3d 146, 447 N.E.2d 1307.
[32] See Section 4852d, Title 42, U.S.Code.
[33] See Chambers, supra, at 567-568, 1998-Ohio-184, 697 N.E.2d 198.