ROSE et al., Appellees,

v.

ZARING HOMES, INC., Appellant.

[Cite as *Rose v. Zaring Homes, Inc.* (1997), 122 Ohio App.3d 739.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–960571.

Decided Sept. 19, 1997.

740

*Theodore J. Froncek*, for appellees.

*Jeffrey A. Dehner*, for appellant.

*Aronoff, Rosen & Hunt, Stephen R. Hunt* and *Valerie Van Valkenburg*, for *amicus curiae* Home Builders Association of Greater Cincinnati.

MARIANNA BROWN BETTMAN, Judge.

## FACTS

Jerry and Colleen Rose, plaintiffs-appellees in this action, signed a contract with defendant-appellant Zaring Homes, Inc. to have a new house built for them in the Lakota Springs Subdivision in West Chester, Ohio. Zaring's agent working with the Roses was Tim Wells, vice president of sales and a licensed real estate broker. Initially, the Roses, with the assistance of Wells, selected Lot 45 on Meadowbrook Court. The week after the contract had been signed, Wells telephoned the Roses several times in Chicago, where they then lived. He asked the Roses to come back to Cincinnati to consider a different lot from the one they had purchased. He suggested they might prefer Lot 49 to Lot 45.

The parties differ significantly on why Wells wanted the Roses to consider a different lot. Wells says it was to better meet their wish for a side-entry garage, which could not be accommodated on Lot 45, and because the direction of the sun better suited their house plan. The Roses claim that Wells specifically represented to them that an unimproved "green space" would be maintained north of Lot 49, and that this specific representation induced them to agree to change their lot from 45 to 49. The parties canceled their old contract and signed a new contract for Lot 49. The contract price was $279,540. Wells waived the $7500 premium for Lot 49.

The Roses closed on the new deal in May of 1992. Their house was built on Lot 49, and they moved on November 19, 1992. They were quite happy with the house. In the spring of 1993, signs of construction began to appear in the green space. Zaring was building houses there, one of which, on Lot 149, was built on a "panhandle lot" ten feet from the Roses' rear property line. The configuration of this new house was designed in such a way as to give the Roses minimum privacy. The back of the house is against the back of the Rose house. The houses are fifty-three feet apart. The windows of the new house face the Rose house. The Rose master bedroom looks right into the kitchen of the new house. There is no green space.

## THE LAKOTA SPRINGS SUBDIVISION

Zaring's Lakota Springs Subdivision was built in four phases. At Zaring, the land development and home construction departments are wholly separate from each other. It is Zaring's custom to require a certain number of lots in one phase to be sold before allowing the sale of lots in the next phase. According to Zaring, its sales people sell from the record plat for that phase, so they know exactly what they are selling. It was also typical for the houses in different phases to be

of different price ranges, with different lot sizes. At the low end were the Cornerstone Series homes, and at the high end were the Masters Edition homes. The Rose house is a Masters Edition house. The house on Lot 149 is a Cornerstone house.

At the time the Roses bought their lot, Lakota Springs Subdivision Development was just entering phase two. The undeveloped property to the north of their lot was part of phase four. To the naked eye, when viewed from the Roses' property, the area consisted of mud and trees.

## RECORDED INFORMATION

A developer begins the development of a subdivision by filing a preliminary plat with the planning division of the department of development of the county where the property is located, in this case, Butler County. This preliminary plat is a general overall idea of what the subdivision will be like. Thereafter, it goes through many steps. Ultimately, a final plat which has been approved by all the necessary departments and commissions is filed with the county recorder's office. That is the record plat and is the official, detailed version of the layout of that particular phase, with exact lot lines, streets, rights of way, and the like.

The preliminary plat for the entire Lakota Springs Subdivision had been on file and available for public inspection since June 1991.[1] On this preliminary plat, there is no area of open green space between Meadowbrook and Lakota Springs Drive. In other words, there is no area of dedicated green space behind what became the Roses' back yard. On this preliminary plat, Lakota Springs Drive, the street to the north of Meadowbrook, is shown as forming a half-circle, or island, around the lots to the north of the Rose property. This concept is called an "eyebrow." There are thirty-foot-setback requirements for these lots. Lots 149 and 150 do not exist on the preliminary plat, nor are there panhandle lots on that plat.

The record plat for phase two was filed with the county recorder on December 19, 1991. There is no permanent dedicated green space on this record plat. There is no aspect of phase four on these plans. That space is blank.

The record plat for phase four was filed with the county recorder on February 19, 1993. There is no permanent dedicated green space on this record plat. The concept of an eyebrow, shown on the preliminary plat, was changed, and instead the record plat showed two new panhandle lots on Lakota Springs Drive, serviced by an access drive. This change allowed two extra lots to be developed in this

---

1. The subdivision lots do not have the same numbers on the preliminary and record plats.

phase. One of these lots, number 149, the one directly abutting the Rose property, has a setback line of only ten feet.[2]

## POSITIONS OF THE PARTIES

It was the position of the Roses that the only reason they agreed to switch from Lot 45 to Lot 49 was Tim Wells's verbal representation to them that there was and would remain a dedicated green space behind their back yard. This green space, about the size of a football field, would form a natural barrier and separate their house from the less expensive Cornerstone Houses constructed in phase four of development. Barry Rose, Jerry's brother, testified at trial that he heard Wells make this representation. Two sets of neighbors testified that other Zaring representatives had made the same oral representation to them. One set of neighbors testified also that they were shown an artist's rendition of the development on the wall of the model home, which depicted no houses behind the Roses' home.

The Roses concede that there is nothing in their purchase contract or deed about any green space, and that they never went to the courthouse to look at any plat or hired an attorney to do so on their behalf.

On behalf of Zaring, Tim Wells testified that he showed the Roses where Lakota Springs Drive was planned, and told them that there would be Cornerstone Houses on Lakota Springs Drive. He said he made no representations about the land behind the Roses' house and denied ever telling the Roses that there would be a dedicated area of green space there. He had no record plat available for phase four at the time he sold the Roses their lot. He testified that, consistent with Zaring policy, he knew no specifics about phase four, which was not developed yet.

## THE ROSES' CLAIMS AGAINST ZARING

### A. Fraudulent Misrepresentation

The Roses brought two claims against Zaring, one for fraudulent misrepresentation, the other for a violation of the Ohio Consumer Sales Practices Act. Two key differences in these claims are the seller's intent and the duties of a buyer as opposed to a consumer.

■ An action for fraudulent misrepresentation requires proof of (1) a representation (or concealment where there is a duty to disclose) (2) which is material

---

2. An interesting, but inconclusively presented, aspect of this case was whether a zoning variance was needed for the two panhandle lots, and whether the Roses, as adjacent property owners, should have received or did receive notice of this.

to the transaction, (3) made falsely, with knowledge of or reckless disregard as to its falsity, (4) with the intent of misleading another into relying on it, (5) justifiable reliance on the misrepresentation or concealment, and (6) resulting injury proximately caused by the reliance. *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus, citing with approval in *Cohen v. Lamko* (1984), 10 Ohio St.3d 167, 10 OBR 500, 462 N.E.2d 407; *Brewer v. Brothers* (1992), 82 Ohio App.3d 148, 611 N.E.2d 492.

■ Because reliance on the representation must be justifiable, caveat emptor may defeat the recovery of a buyer in some circumstances; in others not. In a claim for recovery for a structural defect, a buyer cannot recover if the condition is open to observation or discoverable upon reasonable inspection, the buyer has the unimpeded opportunity to examine the premises, and there is no fraud on the part of the seller. *Layman v. Binns* (1988), 35 Ohio St.3d 176, 519 N.E.2d 642, syllabus. On the other hand, a seller has the duty to disclose material facts that are latent and not readily observable or discoverable through a buyer's reasonable inspection.[3] *Id.* at 178, 519 N.E.2d at 644, citing *Miles v. McSwegin* (1979), 58 Ohio St.2d 97, 12 O.O.3d 108, 388 N.E.2d 1367. Failure to disclose where there is a duty to do so can constitute fraud sufficient to defeat the doctrine of caveat emptor. *Brewer, supra.*

■ With respect to the land itself, there is no right to rely on oral representations regarding the property transferred where the true facts are equally open to both parties. *Traverse v. Long* (1956), 165 Ohio St. 249, 59 O.O. 325, 135 N.E.2d 256; *Van Horn v. Peoples Banking Co.* (1990), 64 Ohio App.3d 745, 582 N.E.2d 1099. As stated by this court in *Noth v. Wynn* (1988), 59 Ohio App.3d 65, 67, 571 N.E.2d 446, 449,

"Where any adversities regarding title to property are of record and therefore easily discoverable, the purchaser of the property is not entitled to rely upon the alleged misrepresentations of the seller or the seller's agent." See, also, *Higginbottom v. Manhattan Life Ins. Co.* (Feb. 3, 1994), Cuyahoga App. No. 64633, unreported, 1994 WL 30428.

Thus, under certain circumstances, a buyer's failure to inspect can defeat a claim of fraudulent misrepresentation.

---

**3.** The legislature has recently modified the common-law rule of caveat emptor to protect buyers further in R.C. 5302.30. Now a transferor of residential real estate must disclose in writing certain material defects actually known without regard to observability or discoverability.

## B. Consumer Sales Practices Act

 R.C. 1345.02 prohibits and defines unfair or deceptive consumer sales practices under the Ohio Consumer Sales Practices Act, R.C. 1345.01 *et seq.* Intent to deceive is not an element required for a violation of the deceptive-practices portion of the act. *Funk v. Montgomery AMC/Jeep/Renault* (1990), 66 Ohio App.3d 815, 586 N.E.2d 1113; *Fesman v. Berger* (Dec. 6, 1995), Hamilton App. No. C–940400, unreported, 1995 WL 714265. The consumer has no duty which corresponds to that of a buyer in a claim for fraudulent misrepresentation.

## C. Verdict

The jury had a separate interrogatory for each claim. The jury found in favor of Zaring on the fraud claim, and in favor of the Roses on the Consumer Sales Practices Act violation. The jury awarded damages to the Roses in the amount of $61,293.87. There were no special interrogatories itemizing damages. After the verdict in favor of the Roses under the Consumer Sales Practices Act, the court granted their motion for attorney fees. After an evidentiary hearing on the fees, the court awarded attorney fees to the Roses in the amount of $35,962.50. Zaring then filed this appeal, with seven assignments of error. Because we find the first assignment of error dispositive of the appeal, we will focus our analysis on it.

## APPLICATION OF THE OHIO CONSUMER SALES PRACTICES ACT TO THIS CASE

 In its first assignment of error, Zaring argues that the trial court erred in applying the Ohio Consumer Sales Practices Act to this case and in instructing the jury on this issue.[4] We agree.

In 1972, the Ohio legislature enacted R.C. Chapter 1345, the Ohio Consumer Sales Practices Act ("Consumer Act"), Ohio's version of the Uniform Consumer Sales Practices Act. R.C. 1345.02(A) provides that "no supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." Specific representations deemed deceptive are set forth in R.C. 1345.02(B).

The key definition pertinent to this case is the definition of a "consumer transaction." R.C. 1345.01(A) defines a "consumer transaction" as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things."

---

4. The Home Builders Association of Greater Cincinnati has filed a brief *amicus curiae* in support of Zaring on this point.

According to the Ohio Supreme Court, this definition evidences the clear intention of the General Assembly to exclude real estate from the act. *Shore W. Constr. Co. v. Sroka* (1991), 61 Ohio St.3d 45, 48, 572 N.E.2d 646, 648.[5] Thus, in Ohio, as in the uniform act, real estate is not included in the definition of a consumer transaction.[6] According to the official comment to the model act, land transactions are excluded because they are regulated by other specialized legislation.[7] See, also, Roberts and Martz, Consumerism Comes of Age: Treble Damages and Attorney Fees and Consumer Transactions–The Ohio Consumer Sales Practices Act (1981) 42 Ohio St.L.J. 927, 929 ("Consumerism Comes of Age"). This court's decision in *Mihailoff v. Ionna* (May 6, 1987), Hamilton App. No. C–860040, unreported, 1987 WL 10889, is wholly consistent with this view.

Matters seemed clear enough until the Ohio Supreme Court decided *Brown v. Liberty Clubs Inc.* (1989), 45 Ohio St.3d 191, 543 N.E.2d 783. The court began by noting that it was unassailable that the Consumer Act has no application in a "pure" real estate transaction. However, the legal waters became murkier in *Brown* when the court held that the act did apply to "the personal property or services portion of a mixed transaction involving both the transfer of personal property or services and the transfer of real property." *Id.* at syllabus. The opinion itself does not clearly explain what the court considered "personal property or services." Since in the case at bar there is no personal property involved in the dispute, germane to this appeal is a determination of what is meant by the "services portion" of a mixed transaction.

After *Brown*, in *Heritage Hills Ltd. v. Deacon* (1990), 49 Ohio St.3d 80, 551 N.E.2d 125, the Supreme Court declined to apply the Consumer Act to residential

---

5. "When the General Assembly desired to exclude real estate from the scope of the 'consumer transaction' definition, it provided that the definition was limited to goods, services, franchises, and intangibles." *Id.*

6. Compare, *e.g.*, Kan.Stats.Ann. 50–624:
 "(b) 'consumer' means an individual or sole proprietor who seeks or acquires property or services for personal, family, household, business or agricultural purposes;
 "* * *
 "(g) 'property' includes real estate, goods, and intangible personal property."
 Ind.Stats.Ann. 24–5–0.5–2:
 "(1) 'Consumer transaction' means a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible, except securities and policies or contracts of insurance * * *."
 The fact that these legislatures specifically included real estate and the Ohio General Assembly did not buttresses the conclusion that it was the intent of the Ohio General Assembly to exclude real estate from the definition of a consumer transaction.

7. 7A Uniform Laws Annotated, Business and Financial Laws (Master Ed.1985), Uniform Consumer Sales Practices Act, 233, Official Comment to Section 2(1), at 235 ("[o]n the assumption that land transactions frequently are, and should be, regulated by specialized legislation, they are excluded altogether").

lease transactions. The court specifically rejected the argument that a lease was a service, and, citing the Uniform Act Official Comment to Section 2(1), *supra,* held instead that a lease was a conveyance of an interest in real estate which is not covered by the Act. The court found it significant that R.C. Chapter 5321, governing landlord-tenant relationships, adequately and exclusively covered the subject.

In *Keiber v. Spicer Constr. Co.* (1993), 85 Ohio App.3d 391, 619 N.E.2d 1105, the Second District Court of Appeals interpreted *Brown* as extending the Consumer Act to a contract to build a new house. In *Keiber,* the court was persuaded that a residential contractor building a new house was a supplier of consumer services. That interpretation is consistent with the definition of "services" found in the Ohio Administrative Code, which defines "services" as the "[p]erformance of labor for the benefit of another. Services include, but are in no way limited to, the construction of a single family-dwelling unit by a supplier on the real property of a consumer." Ohio Adm.Code 109:4-3-01(C)(2).

Our court accepted *Keiber's* interpretation of consumer services in *Fesman v. Berger* (Dec. 6, 1995), Hamilton App. No. C-940400, unreported, 1995 WL 714265.[8] It is this line of reasoning on which the Roses rely in this case, and on which they argue that the trial court correctly determined that the Consumer Act applies to their case. We disagree, and distinguish *Keiber* and *Fesman* for two reasons.

First, the consumer complaint in *Keiber* was clearly related to the construction of the house, not to the land transaction. The fact that the vendor/builder also sold land to the buyer was incidental to the holding. In fact, the *Keiber* court expressly determined that residential construction is not equivalent to a contract to buy land. To the courts in both *Keiber* and *Fesman* the most persuasive reason for extending the Consumer Act to new home construction was the buyer's lack of opportunity to inspect what he or she was getting before buying it. *Keiber,* 85 Ohio App.3d at 396, 619 N.E.2d at 1109; *Fesman, supra.* That rationale is consistent with the overriding purpose of the Consumer Act, which is to eliminate overreaching, to eliminate inequality in the positions of seller and buyer, and to equalize access to key information.[9]

---

8. We do not necessarily find *Mihailoff* and *Fesman* irreconcilable, at least on their statements of the law. We take *Mihailoff* to mean that the Consumer Act does not apply to pure real estate transactions. We take *Fesman* to mean that the Consumer Act can apply to the new-construction portion of a mixed transaction.

9. For an excellent list of the kind of things to which the Act is intended to apply, see *Consumerism Comes of Age, supra,* at Appendix, "Prohibited Sales Practices," 961–964.

This rationale is wholly inapplicable in this case. The Roses were entirely satisfied with the construction of their house. Their complaint was strictly about the real property—namely an alleged misrepresentation about the green space. Their complaint was not even about their own land, but rather about land allegedly promised to be dedicated for the common good. The Roses had an unimpeded opportunity to inspect the public records about the realty in this case in advance of their purchase. We thus expressly decline to hold that Wells's verbal representations about the green space constituted a service covered by the Consumer Act. Therefore, we find no consumer transaction. Compare *Martin v. Bullinger* (1988), 43 Ohio App.3d 136, 539 N.E.2d 681 (services of plumbing and heating company to repair gas leak in residence considered a consumer transaction under the Act); *State ex rel. Celebrezze v. Ferraro* (1989), 63 Ohio App.3d 168, 578 N.E.2d 492 (solicitation and sale of residential pest-control inspection and treatment services considered a consumer transaction under the Act); *Beck v. Trane Co.* (Dec. 19, 1990), Hamilton App. Nos. C–890610 and C–890623, unreported, 1990 WL 209688 (sale of residential air conditioning and heating system considered a consumer transaction covered by the Act), with *Whitman v. Erie Island Resorts* (Dec. 30, 1996), Ottawa App. No. OT–96–010, unreported, 1996 WL 748182 (purchase of fractional fee simple interest in resort was pure real estate transaction and Consumer Act did not apply).

Second, as discussed previously, in Ohio, there has long been a significant body of common law dealing with allegations of misrepresentations of real estate. Additionally, one of the oldest and most time-tested regulations of land transactions is codified at R.C. 1335.04 and R.C. 1335.05. It is known as the Statute of Frauds, and provides in part:

"No lease, estate, or interest, either of freehold or term of years, or any uncertain interest of, in, or out of lands, tenements, or hereditaments, shall be assigned or granted except by deed, or note in writing, signed by the party assigning or granting it, or his agent thereunto lawfully authorized, by writing, or by act and operation of law" R.C. 1335.04.

"No action shall be brought * * * upon a contract or sale of lands * * * unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized." R.C. 1335.05.

The Statute of Frauds protects both buyer and seller, and seems to us quite pertinent to this case. The pertinence of the Statute of Frauds was even recognized by Mr. Rose, who testified that friends and attorneys he consulted after the fact all told him that if he had no writing about the green space, he had no case. *Cf. Marion Production Credit Assoc. v. Cochran* (1988), 40 Ohio St.3d 265, 533 N.E.2d 325.

We hold that the transaction involved in this case is a pure real estate transaction, governed by the immense body of real estate law. As such, the transaction is not subject the Consumer Sales Practices Act, and the trial court erred in instructing the jury on this issue.[10]

## CONCLUSION

Based on our analysis, we hold that the trial court erred in holding that the Ohio Consumer Sales Practices Act applied to this case, and in instructing the jury on this issue. Zaring's first assignment of error is sustained. Because of our holding that the Consumer Sales Practices Act is inapplicable to this case, there is no basis on which to award attorney fees. Accordingly, Zaring's seventh assignment of error challenging the attorney fees is sustained. Because of our disposition of the foregoing, and because of the fact that the jury came to a defense verdict on the only other claim before it, Zaring's second, third, fourth, fifth, and sixth assignments of error are moot, and we will not address them. App.R. 12(A)(1)(c).

The judgment entered on the jury's verdict in favor of the plaintiffs under the Consumer Sales Practices Act is reversed. Final judgment in this case is entered in favor of Zaring Homes.

*Judgment accordingly.*

GORMAN, P.J., and SUNDERMANN, J., concur.

---

10. There is some confusion about whether the court determined this issue as a matter of law, or whether it let the jury determine whether the Act applied. The issue of whether the Act applied in this case was one of law for the court. *Brown v. Liberty Clubs, Inc.* (Mar. 21, 1988), Warren App. No. CA87–05–040, unreported, 1988 WL 34062, reversed on other grounds (1989), 45 Ohio St.3d 191, 543 N.E.2d 783. While the court, in its charge, did erroneously ask the jury to determine whether the transaction in the case was a consumer transaction, it is clear from the record that the court had previously determined that the Consumer Act applied in this case on the authority of the Supreme Court's decision in *Brown* and this court's decision in *Keiber.*