**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0318n.06

No. 12-3526

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Apr 01, 2013*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JASON MILNER et al., | ) | |
| | ) | |
| **Plaintiffs-Appellants,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| ROBIN BIGGS et al., | ) | |
| | ) | |
| **Defendants-Appellees.** | ) | **O P I N I O N** |
| | ) | |

Before:  MOORE and STRANCH, Circuit Judges, and HOOD, District Judge.[*]

**KAREN NELSON MOORE, Circuit Judge.**  Jason and Natasha Milner ("the Milners")

bought Robin Biggs's house.  The house turned out to be a lemon; the Milners soon discovered mold

in several rooms and moisture damage in the crawl space.  The Milners brought state and federal

claims against Biggs, the home inspector, the real-estate agency representing Biggs, the Milners'

own real-estate agents, and the title company.  The district court dismissed several claims in response

to two motions for judgment on the pleadings, and granted summary judgment to all defendants on

the remaining claims.  We **AFFIRM** the district court's judgment with respect to all counts.

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

No. 12-3526
*Milner, et al. v. Biggs, et al.*

## I. BACKGROUND & PROCEDURE

In 2010, the Milners decided to buy a house.  They conducted two cursory walkthroughs of Biggs's house with an agent from Realtec Real Estate ("Realtec"),[1] at which point the Milners made an offer through Biggs's real-estate agent at Larry DePugh Realty ("DePugh Realty").  After several rounds of negotiations, Biggs and the Milners signed a contract on April 12, 2010 to sell the house "as-is."  R. 1-4 (Purchase Contract) (Page ID #32–34).  They later signed an addendum that states that "[t]he purchaser is satisfied with the condition of the property and purchaser has not in any way[] relied upon any representations of seller . . . or agents concerning the past or present existence of mold in or around the property."  R. 111-3 (Mold Addendum) (Page ID #1646).

Before closing, the Milners wanted the home inspected.  They asked Realtec for a recommendation; Realtec's agent told the Milners that Frank Roberts was a certified home inspector who had worked with Realtec before, and that Roberts was "the best."  R. 70-1 (Natasha Milner Dep. at 37–39) (Page ID #597–98).  Roberts received his certification through Inspection Training Associates ("ITA"), a home-inspection course out of Virginia; Roberts had not completed enough inspections to join the American Society of Home Inspectors ("ASHI").  R. 101 (Roberts Dep. at 8–9, 18) (Page ID #1160–61, 1163).  Although Realtec's agent offered to provide the Milners with

---

[1]The complaint identifies a number of defendants including Realtec, Realtec's owner Angela Shanks, and the Milners' agent Brenda DePugh.  Because the claims against these three defendants are, by this point, factually and legally indistinguishable, this opinion refers to all three by the shorthand "Realtec."

a list of additional home inspectors, they declined the list and hired Roberts. R. 70-1 (Natasha Milner Dep. at 38) (Page ID #598).

Roberts inspected the home. He testified to being unable to inspect thoroughly the crawl space because the space allowed only twenty inches of clearance, and because fallen ducts blocked access. R. 101 (Roberts Dep. at 31–36) (Page ID #1166–67). His report stated that the "crawl space is dry," but that the foundation was only partially visible, that it was "difficult to access [the] entire area," and that areas that were inaccessible were "not included in this inspection." R. 101-1 (Inspection Report at 1, 6) (Page ID #1191, 1197). Roberts included with his report a copy of ASHI's "Standards of Practice and Code of Ethics"; the document includes a disclaimer that "[d]istribution of this material is not an indication of ASHI membership." R. 83-2 (ASHI Standard of Practice at 2) (Page ID #862). The Milners did not review these materials until the closing on the house, though they did consult a one-page summary which mentioned that the ducts were disconnected, but otherwise said nothing about the crawl space. R. 70-1 (Natasha Milner Dep. at 187–89) (Page ID #635); *see* R. 101-1 (Inspection Report at G/N) (Page ID #1188). Before closing, Biggs had the ducts reattached, and other items on the summary were repaired; these changes are recorded in the purchase contract addenda.

The Milners closed on May 18, 2010. Arrow Title ("Arrow") prepared the deed, which identified Jason Milner as the owner. R. 30-1 (General Warranty Deed) (Page ID #337). However, the Milners intended for both of their names to appear on the deed. Arrow has since prepared and

provided a quitclaim deed correcting the error, R. 146-2 (Quitclaim Offer Letter) (Page ID #2157–58), but the Milners have not filed this new document.

Shortly after moving in, the Milners noticed problems with the house. Jason Milner entered the crawl space and noted that the floor joists "[a]ppeared to be all rotted." R. 69-1 (Jason Milner Dep. at 79) (Page ID #571). The Milners also detected suspected mold in the bathroom, attic, storage room, and spare closet. A new home inspection confirmed that there was moisture in the crawl space, that certain joists had deteriorated, and that mold was likely present in the suspected areas. R. 41-1 (Parker Inspection Report) (Page ID #378–418).

The Milners brought suit in the Court of Common Pleas for Pike County, Ohio. They alleged various causes of action—violations of the Ohio Consumer Sales Practices Act ("OCSPA"), violations of the federal Real Estate Settlement Procedures Acts ("RESPA"), negligence, negligent misrepresentation, breach of fiduciary duty, conspiracy, fraudulent concealment, fraudulent inducement, fraud, breach of contract, and unjust enrichment—against Biggs, Roberts, DePugh Realty, Realtec, and Arrow. R. 1-3 (Complaint) (Page ID #9–27). On the basis of the RESPA claims, the defendants successfully removed the case to the U.S. District Court for the Southern District of Ohio. On June 8, 2011, the district court granted Arrow's motion for judgment on the pleadings with respect to the OCSPA claim, which the Milners now appeal. See R. 48 (Op. & Order) (Page ID #439–51). On April 6, 2012, the district court granted Realtec's motion for judgment on the pleadings with respect to the OCSPA and conspiracy claims. R. 141 (Op. & Order

at 16–18) (Page ID #2077–79). In the same order, it granted summary judgment to all defendants on all remaining claims. The Milners timely appealed.

## II. STANDARD OF REVIEW

The district court dismissed some claims brought by the Milners on motions for judgment on the pleadings brought under Federal Rule of Procedure 12(c), and granted summary judgment on the remaining claims. We review a grant of judgment on the pleadings de novo, just as we would an order granting a motion to dismiss. *EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001). "'In reviewing the motion, we must construe the complaint in the light most favorable to the plaintiff[s], accept all of the complaint's factual allegations as true, and determine whether the plaintiff[s] undoubtedly can prove no set of facts in support of [their] claim that would entitle [them] to relief.'" *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006) (quoting *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 512 (6th Cir. 2001)).

With respect to summary judgment, we review the district court's decision de novo. *Med. Mut. of Ohio v. K. Amalia Enters. Inc.*, 548 F.3d 383, 389 (6th Cir. 2008). Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When determining whether a "genuine issue for trial" exists, we accept the facts as alleged by the Milners to be true, and draw reasonable inferences in their favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citations omitted) (explaining Fed. R. Civ. P. 56)).

### III.  JUDGMENT ON THE PLEADINGS

The district court granted Arrow's and Realtec's motions for judgment on the pleadings as to the Milners' OCSPA claims because it found that the parties did not participate in a "consumer transaction" covered by OCSPA.  R. 48 (Op. & Order at 6–10) (Page ID #444–48) (Arrow); R. 141 (Op. & Order at 16–18) (Page ID #2077–79) (Realtec).   The Milners now raise two central arguments.  First, they claim that OCSPA does not exempt either title agencies or real-estate brokers; accordingly, the Milners argue that the district court erred in exempting these parties.  Appellants' Br. at 19, 21.   Second, they narrowly interpret OCSPA's exception for "pure real-estate transactions," *see Brown v. Liberty Clubs, Inc.*, 543 N.E.2d 783, 785 (Ohio 1989), as applying only to services that are required to transfer real property.[2]  That is, the Milners argue that the services provided by real-estate agents and title agencies are merely "collateral to" the transfer of real property—property could exchange hands without the assistance of either a title agency or a broker—and therefore that the exception should not apply.  *See* Mot. to Certify Questions of Law to the Supreme Ct. of Ohio at 14.

---

[2]The Milners argue that Ohio courts have extended OCSPA's real-estate exception beyond either the rule articulated by the Ohio Supreme Court in interpreting Ohio Rev. Code Ann. § 1345.01, *see Brown*, 543 N.E.2d at 785, or beyond the scope of § 1345.01 itself.  Accordingly, they ask us to certify a question of law to the Ohio Supreme Court—although no specific question was provided—to determine whether Ohio courts have misapplied *Brown*, or whether *Brown* itself misconstrues § 1345.01. "[T]he federal courts generally will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks. When we see a reasonably clear and principled course, we will seek to follow it ourselves." *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009) (internal quotation marks omitted).  We are able to resolve the instant dispute through principled attention to clear Ohio law, and so we conclude that certification is unnecessary.

OCSPA provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." Ohio Rev. Code Ann. § 1345.02(A) (West 2012). OCSPA defines a consumer transaction, with exceptions not applicable here, as follows:

> "Consumer transaction" means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things.

Ohio Rev. Code Ann. § 1345.01(A). The Supreme Court of Ohio, in interpreting § 1345.01(A), has held that OCSPA "has no application in a 'pure' real estate transaction." *Brown*, 543 N.E.2d at 785. By contrast, it held OCSPA does apply to "the personal property or services portion of a mixed transaction" when a real-estate transaction is "inextricably intertwined" with "the transfer of personal property or services." *Id.* at 786 (concluding that using gifts to induce consumers to attend a real-estate sales pitch constitutes a mixed transaction). In distinguishing pure and mixed transactions, the Ohio Court of Appeals has clarified that "[a] collateral service solely associated with the sale of real estate is a pure real estate transaction." *Hurst v. Enter. Title Agency, Inc.*, 809 N.E.2d 689, 697 (Ohio Ct. App. 2004).

With respect to Arrow, the Milners' complaint alleges that Arrow "fail[ed] to provide executed copies of all documents signed or initialed by Plaintiffs" and "failed to prepare the closing documents in accordance with the Purchase Contract." R. 1-3 (Complaint at ¶¶ 57, 59) (Page ID #15–16). Assuming these allegations are true, we conclude that they describe a pure real-estate transaction. The Milners acknowledge that Arrow assisted in preparing and filing "the documents pertinent to the transfer of the property" and "helped [the Milners] with the purchase documents at

7

the time of the closing." Appellants' Br. at 20. And they have provided no explanation for how these services are anything but "collateral services solely associated with the sale of real estate." The Milners' observation that title could have passed without a title company's assistance is irrelevant to whether Arrow's services were collateral solely to the sale of Biggs's house. In holding that the services at issue are associated with a pure real-estate transaction and are therefore not covered by OCSPA, our conclusion sits comfortably with other decisions by Ohio courts interpreting OCSPA's real-estate exception. *See Heritage Hills, Ltd. v. Deacon*, 551 N.E.2d 125, 128 (Ohio 1990) (excluding "residential lease transactions" from OCSPA); *Hurst*, 809 N.E.2d at 697 (excluding escrow services); *Colburn v. Baier Realty & Auctioneers*, No. 2002-T-0161, 2003 WL 22931379, at *4 (Ohio Ct. App. Dec. 12, 2003) (unpublished opinion) (excluding services of a real-estate auctioneer); *Rose v. Zaring Homes, Inc.*, 702 N.E.2d 952, 957–58 (Ohio Ct. App. 1997) (holding that a contract to build a new home, but not the underlying property conveyance, is subject to OCSPA); *Keiber v. Spicer Constr. Co.*, 619 N.E.2d 1105, 1107–09 (Ohio Ct. App. 1993) (holding that a contract to build a new home is a "service," and so is a mixed transaction under OCSPA). Therefore, the district court properly granted judgment on the pleadings to Arrow with respect to the Milners' OCSPA claims.

The same conclusion applies to Realtec's services in this case. The Milners allege that Realtec violated OCSPA by "steering Plaintiffs to Defendant Arrow," "representing [that] Defendant Arrow would properly perform the required closing services," "representing that Defendant Roberts was certified at home inspections . . . and that Defendant Roberts would provide a competent home

inspection," "representing [themselves] to be competent real estate agents," "failing to discuss with Plaintiffs the terms of the Purchase Contract, specifically the 'as-is' clause or recommending Plaintiffs seek legal counsel," "failing to provide executed copies of all documents signed or initialed by Plaintiffs," and "knowingly tak[ing] advantage of . . . Plaintiffs' inability to understand the numerous documents involved in a real estate transaction." R. 1-3 (Complaint at ¶¶ 54–61) (Page ID #15–16).[3] These allegations concern Realtec's involvement in recommending a title company and home inspector, and in preparing and providing documents associated with the ultimate sale. These activities are collateral to the sale of Biggs's house; Realtec was "merely acting as an intermediary to effectuate the sale of the real estate." *See Hurst*, 809 N.E.2d at 697. This case is unlike *Brown*, where goods unrelated to the underlying real property were used to induce consumers to consider and ultimately purchase real estate. The Milners decided to buy Biggs's home, and Realtec offered assistance directly related to completing that particular transaction. Accordingly, the district court was correct to grant Realtec's motion for judgment on the pleadings.

---

[3]The Milners also allege that Realtec violated OCSPA by operating "without having registered [its] fictitious name with the Ohio Secretary of State." R. 1-3 (Complaint at ¶ 62) (Page ID #16). "Where no other deceptive acts are alleged in connection with the use of a fictitious business name, the mere failure to register does not violate the [O]CSPA." *Charvat v. Farmers Ins. Columbus, Inc.*, 897 N.E.2d 167, 182 (Ohio Ct. App. 2008). Because the Milners do not allege anything besides the fact that the name "Realtec Real Estate" was not registered, this claim fails to state an OCSPA violation.

## IV.  SUMMARY JUDGMENT

The Milners appeal several claims for which the district court granted summary judgment. We address those claims regarding each party.

### A.  Biggs (Seller)

The district court granted summary judgment to Biggs on seven claims.  R. 141 (Op. & Order at 8–12) (Page ID #2069–73).  The Milners apparently contest three claims on appeal:  fraud, fraudulent concealment, and civil conspiracy.[4]  First, they claim that Biggs fraudulently misrepresented the condition of her home.  Appellants' Br. at 22.  Second, because Jason Milner could observe the structural damage to the house, they claim this is evidence that Roberts never inspected the crawl space.  *Id*.  Third, they argue that the district court erred in finding that there was no evidence of malice sufficient to satisfy a conspiracy claim.  *Id.* at 23.  The district court, for its part, found that Biggs made no representations with respect to mold in the house, and was under no duty to disclose a latent defect when selling her house "as is."  R. 141 (Op. & Order at 8–9) (Page ID #2069–70).  It further found that, with respect to the crawl space, there was no evidence offered beyond speculation by Natasha Milner that Biggs fraudulently represented her awareness of the defect on the Residential Property Disclosure Form.  *Id.* at 11 (Page ID #2072).  Finally, because it found that Biggs lacked knowledge of the defects, the district court held that she could not have acted with malice in selling the house, nor had the Milners made any showing with respect to an

---

[4]Biggs appears to be proceeding pro se on appeal and has not filed a response brief.

agreement between the parties necessary to maintain the other elements of a civil-conspiracy claim.

*Id.* at 12 (Page ID #2073).

Ohio law establishes the following elements for torts of fraud:

The elements of fraud or fraudulent misrepresentation [or fraudulent concealment] are (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) followed by justifiable reliance upon the representation or concealment by the other party, and (6) a resulting injury proximately caused by the reliance.

*Funk v. Durant*, 799 N.E.2d 221, 224 (Ohio Ct. App. 2003); *see also Groob v. KeyBank*, 843 N.E.2d 1170, 1178 (Ohio 2006).[5] The use of an as-is contract "relieve[s] a seller of any duty to disclose," though it "does not provide a defense to fraudulent misrepresentations." *Funk*, 799 N.E.2d at 224.

With respect to misrepresentations about mold, the only evidence identified is that Biggs stated on the Residential Property Disclosure Form that she had not performed a mold inspection. R. 1-4 (Property Disclosure Form at 2) (Page ID #29). That same form—signed by both

---

[5]The Milners' complaint alleges *negligent* misrepresentation, which the district court addressed. Their appeal, however, addresses fraudulent misrepresentation.

The elements of negligent misrepresentation are as follows: One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989) (internal quotation marks omitted) (emphasis omitted). Because the Milners could intend for their arguments about fraudulent misrepresentation to concern negligent misrepresentation, rather than fraud, we analyze their arguments under both fraud and negligence standards.

parties—stated that "every home contains mold," and that it was the Milners' responsibility to have a mold inspection performed. *Id.* Later, the Milners signed a Mold Addendum that stated, among other things, that they "ha[d] not in any way[] relied upon any representations of seller . . . concerning the past or present existence of mold in or around the property." R. 111-3 (Mold Addendum) (Page ID #1646). Accordingly, there is no genuine dispute that the Milners did not justifiably rely on a misrepresentation about the presence of mold in Biggs's home.

Biggs stated that she was unaware of water damage in the crawl space. R. 1-4 (Property Disclosure Form at 2) (Page ID #29). Natasha Milner averred that Biggs would have learned of the water damage when performing home repairs, although Natasha stated that "I'm speculating" in this conclusion. R. 70-1 (Natasha Milner Dep. at 148) (Page ID #625). "Speculation, unsupported by facts in the record, is insufficient to create a genuine issue of material fact and falls short of what is required to survive summary judgment." *Am. Rd. Serv. Co. v. Consol. Rail Corp.*, 348 F.3d 565, 569 (6th Cir. 2003). The Milners argue on appeal that the damage in the crawl space was so obvious to Jason Milner upon inspection that Roberts could not have conducted an investigation without seeing it. This argument does not create a genuine issue of material fact as to Biggs's knowledge for two reasons. First, Roberts and Jason Milner inspected the crawl space at different times: Roberts when the crawl space was obstructed by fallen ducts, and Jason Milner after the ducts were raised. Second, even assuming the damage was visible to Roberts, at issue is Biggs's knowledge. The Milners have offered no evidence that Biggs knew of the moisture damage, or that she failed to exercise reasonable care by taking the word of a certified home inspector. Accordingly, there is no genuine dispute as

12

to whether Biggs knew or should have known that her representation about the water damage was inaccurate.[6]

To maintain a claim of civil conspiracy, there must be "'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998) (quoting *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995)). "Moreover, '[a]n underlying unlawful act is required before a civil conspiracy claim can succeed.'" *Chesher v. Neyer*, 477 F.3d 784, 805 (6th Cir. 2007) (quoting *Williams*, 700 N.E.2d at 868). Insofar as the district court was correct to find that there was no genuine dispute that no underlying fraudulent conduct occurred, there is no basis to support a charge of civil conspiracy. Accordingly, the district court was correct to grant summary judgment to Biggs.

## B. Roberts (Home Inspector)

The district court granted summary judgment to Roberts on six claims. R. 141 (Op. & Order at 25–27) (Page ID #2086–88). The Milners now appeal two claims: negligent misrepresentation and fraud. Appellants' Br. at 30–31. With respect to the negligent-misrepresentation claim, the district court found that Roberts had not misrepresented the fact that he was a certified home inspector. R. 141 (Op. & Order at 26) (Page ID #2087). Likewise, the district court found that

---

[6]For the same reasons, the district court was correct to grant summary judgment in favor of Biggs on the fraudulent-concealment claim. The Milners can identify no evidence that they justifiably relied on any statements by Biggs concerning mold, nor any evidence that Biggs knew of, and therefore could have concealed, evidence of moisture damage.

Roberts did not misleadingly indicate affiliation with ASHI by including with his inspection reports ASHI documents, because those documents stated that "[d]istribution of this material is not an indication of ASHI Membership." *Id.* (quoting R. 83-2 (ASHI Standards of Practice at 2) (Page ID #862)). Finally, even assuming that the inclusion of ASHI materials amounted to a misrepresentation, the district court found that the Milners could not have relied on this information, because the Milners admit that they did not read Roberts's inspection report before the closing. *Id*.

We first address Roberts's qualifications. The Milners do not deny that Roberts is an ITA-certified inspector. Instead, they reassert throughout their appeal that Roberts was not an ASHI-certified inspector.[7] However, they offer no argument as to why this fact—that Roberts is not a member of ASHI—would make it false to assert that Roberts was a certified home inspector. Although ASHI's standards are more exclusive, Roberts is nevertheless certified. Ohio does not require home inspectors to be certified, either by ASHI or any other organization. The Milners did not inquire into Roberts's credentials, although Natasha Milner testified that she assumed an organization like ASHI exists to which Roberts belonged. This assumption alone is insufficient to render false Roberts's actual certification; there was no misrepresentation. Neither did Roberts misrepresent his qualifications by providing ASHI materials, because the materials themselves state that "[d]istribution of this material is not an indication of ASHI membership." R. 83-2 (ASHI Standard of Practice at 2) (Page ID #862). Even it this were a misrepresentation, the Milners admit

---

[7]Roberts testified that his training with and certification by ITA qualifies him to join ASHI once he completes 250 inspections. R. 101 (Roberts Dep. at 18) (Page ID #1163). At the time, Roberts had completed approximately 80 inspections. *Id*. at 19 (Page ID #1163).

that they did not look at the report—they viewed only a one-page summary—until after the deed was conveyed. R. 70-1 (Natasha Milner Dep. at 189–90) (Page ID #635–36). Thus, they could not have relied on the ASHI materials as an implied representation of Roberts's membership therein. The Milners cannot claim that Roberts misrepresented, either fraudulently or negligently, his credentials. Accordingly, the district court correctly found that there was no genuine dispute on this claim.

With respect to the inspection and inspection report, the district court found again that, because the Milners did not read Roberts's inspection report, there was no genuine dispute that they did not rely on it. R. 141 (Op. & Order at 26) (Page ID #2087). Moreover, the district court found that Roberts accurately described the house to the extent that he could inspect it, that his report made clear that he had not inspected inaccessible areas, and that any reliance on his limited inspection for more than was stated in the report was unreasonable as a matter of law. *Id*. at 26–27 (Page ID #2087–88). The Milners offer two arguments on appeal. First, they claim that they relied on the inspection report's one-page summary, which Roberts himself prepared. Appellants' Br. at 30–31. Second, they argue that there remains a genuine dispute as to whether a diligent home inspector would have discovered the moisture damage. *Id*. at 31.

To the extent that the Milners' theory of fraud argued on appeal concerns Roberts's inspection, it is inconsistent with the fraud alleged in their complaint. A plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Milners' complaint identifies as an instance of fraud only Roberts's "oral and written representations to Plaintiffs that he is a certified home inspector." R. 1-3 (Complaint at ¶ 145) (Page ID #22). The

complaint does not allege that aspects of Roberts's inspection were fraudulent. Accordingly, there is no claim for us to review with respect to whether Roberts fraudulently performed his inspection. Thus, the district court was correct in granting summary judgment to Roberts on the entirety of the Milners' fraud claim.

## C. DePugh Realty (Seller's Agents)

The district court granted summary judgment to DePugh Realty on seven claims. R. 141 (Op. & Order at 12–15) (Page ID #2073–76). On appeal, the Milners contest only the OCSPA claim. They argue that DePugh Realty violated OCSPA by operating under a fictitious name that had not been registered with the Secretary of State. Appellants' Br. at 23–24. As previously explained, *see supra* note 3, failing to register a fictitious name constitutes "a deceptive and unfair practice [under OCSPA] only when used by the entity in connection with some effort to avoid its responsibilities to consumers." *Charvat v. Farmers Ins. Columbus, Inc.*, 897 N.E.2d 167, 182 (Ohio Ct. App. 2008). The Milners have not alleged any deceptive acts tied to the use of the name DePugh Realty. Accordingly, the district court was correct to find that no genuine dispute existed.

## D. Realtec (Buyers' Agents)

The district court granted summary judgment for Realtec on five claims, and in the same order it granted Realtec's motion for judgment on the pleadings with respect to the Milners' OCSPA and civil-conspiracy claims. R. 141 (Op. & Order at 18–24) (Page ID #2079–75). The OCSPA claim is addressed *supra* in Section III. With respect to the remaining claims, the Milners contest three on appeal: negligent misrepresentation, negligence, and breach of fiduciary duty. Appellants'

Br. at 25–28. The district court dismissed the negligent-misrepresentation claim as it concerns Roberts because Realtec's agent did not misrepresent the truth when she said that Roberts was a certified home inspector. R. 141 (Op. & Order at 19) (Page ID #2080). In addition, the district court found that a statement that Roberts was "the best" when it came to home inspection was not actionable through a negligent-misrepresentation claim because it amounted to puffery. *Id.* at 19–20 (Page ID #2080–81). As to the negligence and fiduciary-duty claims, the district court found that, as a matter of law, Realtec acted according to the standard of care applicable to real-estate brokers. In particular, it found that Realtec did not breach any duty by describing Roberts as a certified home inspector or by recommending Roberts when it also offered the Milners a list of other house inspectors. *Id.* at 21 (Page ID #2082).

On appeal the Milners offer several arguments. First, the Milners reiterate that Realtec's agent stated that Roberts was "the best," when in fact Roberts was incompetent. Appellants' Br. at 25. Second, the Milners argue that there is no standard of care applicable to OCSPA violations.[8] *Id.* at 25–26. Third, assuming there is a standard of care, the Milners argue that Realtec's agent failed to satisfy that standard by stating that Roberts was certified without having previously required Roberts to produce documentation confirming his home-inspection training. *Id.* at 26.

With respect to negligent misrepresentation, the district court correctly noted that statements of puffery are not actionable under Ohio law. *Kondrat v. Morris*, 692 N.E.2d 246, 251–52 (Ohio Ct.

---

[8]This argument confuses the district court's analysis of negligence and breach of fiduciary duty with its analysis of OCSPA. The OCSPA claim is addressed *supra* in Section III.

App. 1997) ("To be actionable, a misrepresentation generally must relate to an existing or pre-existing fact which is susceptible of knowledge. A statement of opinion or belief such as occurs in 'puffing' generally cannot constitute a misrepresentation.") (internal citations omitted); *accord Davis v. Byers Volvo*, No. 11CA817, 2012 WL 691757, at *8–9 (Ohio Ct. App. Feb. 24, 2012). A statement that Roberts is "the best," then, does not give rise to a claim for negligent misrepresentation. Separately, and in light of the previous discussion of Roberts's certification, it was not a negligent misrepresentation for Realtec's agent to state that Roberts was certified.

With respect to negligence and breach of fiduciary duty, the duty of care for real-estate agents is established by Ohio Rev. Code Ann. § 4735.62. *Carpenter v. Long*, 963 N.E.2d 857, 877 (Ohio Ct. App. 2011). The Milners do not explain which aspect of this duty Realtec's agent violated when it recommended Roberts without having inspected Roberts's certification. Realtec had previously worked with Roberts and had not received any complaints about his performance. Moreover, Roberts was certified; consulting his certification would have confirmed what Realtec already, justifiably, believed to be true. The Milners have failed to explain why the failure to inspect personally Roberts's certification documents amounts to a breach of a broker's duty of care when the Realtec agent correctly identified that Roberts was certified. Accordingly, the district court was correct to grant summary judgment to Realtec.

**E. Arrow (Title Agency)**

In addition to the judgment-on-the-pleadings motions discussed above, the district court granted summary judgment to Arrow on two remaining claims: negligent misrepresentation and

18

negligence. R. 141 (Op. & Order at 24–25) (Page ID #2085–86). The Milners appeal both. The district court granted summary judgment on the negligent-misrepresentation claim because it found that Arrow had never made a representation to the Milners—indeed, both Milners conceded as much—that its deed was correct. *Id.* at 24 (Page ID #2085). The district court granted summary judgment on the negligence claim because it found no evidence that Arrow had acted negligently when it prepared a title based on the order for title insurance. *Id.* at 25 (Page ID #2086). Moreover, even if Arrow had acted negligently, the district court found no evidence of damages; the Milners had never attempted to correct the inaccurate deed and had refused Arrow's offer to correct the deed free of cost. *Id.*; *see* R. 146-2 (Quitclaim Offer Letter) (Page ID #2157–58). The Milners offer two arguments on appeal. First, they argue that Arrow's filing a deed with the county clerk constitutes a representation. Appellants' Br. at 29. Second, the Milners argue that a plaintiff is not required to show damages as part of a successful OCSPA action. *Id.*

With respect to the Milners' second argument, they confuse their OCSPA claim, which we have already discussed, with a negligence action, for which proof of damages is a required element. Because the only damages that the Milners allege is an incorrect title, and because they do not contest that they have been provided a clean title but have refused to file it, *see* R. 146-2 (Quitclaim Offer Letter) (Page ID #2157–58), the Milners cannot establish injury from Arrow's purported negligence, and thus they cannot prevail on their negligence claim.

As to the negligent-misrepresentation claim, even if we were to accept that filing a deed with a county clerk could constitute a misrepresentation, other elements of a successful claim are

nonetheless missing. In particular, Arrow's purported misrepresentation did not stem from a negligent performance of its duties. The Title Order Form is ambiguous as to who is to be listed as the buyer on the title. R. 72-5 (Title Order Form) (Page ID #699). Thereafter, Arrow produced a Title Order Confirmation, which identified only Jason Milner as the buyer. R. 68-3 (Title Order Confirmation). The Milners did not object to the confirmation form. R. 70 (Natasha Milner Dep. at 96) (Page ID #612). The district court was correct to conclude that it was not negligent, as a matter of law, for Arrow to rely on this uncorrected confirmation form in producing a title. Moreover, the Milners cannot demonstrate a pecuniary loss from the mistake; they have refused Arrow's offer to be made whole. R. 146-2 (Quitclaim Offer Letter) (Page ID #2157–58). Summary judgment therefore was appropriate.

## V. CONCLUSION

For the reasons described above, we **AFFIRM** the judgment of the district court.